**Askari Abdullah MUHAMMAD, f/k/a Thomas Knight, Petitioner,**

v.

**Kenneth TUCKER,[1] Respondent.**

**Case No. 06–20570–CIV.**

United States District Court, S.D. Florida, Miami Division.

Nov. 9, 2012.

[1] Kenneth Tucker is the current Secretary of the Florida Department of Corrections, and is now the proper respondent in this proceeding. Mr. Tucker is therefore "automatically" substituted as the respondent under Federal Rule of Civil Procedure 25(d)(1), and the Clerk is directed to amend the docket to reflect this substitution.

Linda McDermott, McClain & McDermott PA, Wilton Manors, FL, Donald Todd Doss, Fort Lauderdale, FL, for Petitioner.

Sandra Sue Jaggard, Attorney General Office Department of Legal Affairs, Miami, FL, for Respondent.

## ORDER CONDITIONALLY GRANTING HABEAS CORPUS PETITION & CLOSING CASE

ADALBERTO JORDAN, District Judge.

This capital case, which has spanned almost 40 years, has been before the Florida Supreme Court four times, and before the Eleventh Circuit once before. On this latest trip through the federal system, I conditionally grant the habeas corpus petition filed by Askari Abdullah Muhammad[2] and order that the state resentence him for the 1974 murders of Sydney and Lillian Gans or commute his death sentences to life sentences.

Normally, the granting of habeas relief in a capital case means that, at least for a while, the defendant is no longer facing execution. Mr. Muhammad, however, is not the typical death-row petitioner, for he killed a prison guard—Officer James Burke—while he was in custody for the Gans murders, and was sentenced to death for that crime as well. The Florida Supreme Court affirmed that conviction and sentence. *See Muhammad v. State,* 494 So.2d 969 (Fla.1986) (*Muhammad II*). Mr. Muhammad eventually sought a writ of habeas corpus in federal court, but the district court denied relief. *See Muhammad v. McDonough,* 2008 WL 818812 (M.D.Fla. Mar. 26, 2008) (*Muhammad III*). And, when Mr. Muhammad sought review of the district court's decision, the

---

**2.** In 1982, pursuant to Fla. Stat. § 68.07, Mr. Muhammad legally changed his name from Thomas Otis Knight to Askari Abdullah Muhammad. *See Muhammad v. Wainwright,* 839 F.2d 1422, 1423 (11th Cir.1987).

Eleventh Circuit denied Mr. Muhammad's request for a certificate of appealability. *See Muhammad v. Sec'y Dep't of Corr.*, 554 F.3d 949 (11th Cir.2009) (*Muhammad IV*). So, regardless of what ultimately happens in this case, Mr. Muhammad will remain on death row awaiting execution for the murder of Officer Burke.

In this proceeding, Mr. Muhammad contends that the state violated his Sixth Amendment Confrontation Clause rights; that his counsel rendered ineffective assistance at the resentencing phase; that the state failed to disclose material evidence or information in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); that the prosecutor made improper and inflammatory remarks in violation of his Eighth and Fourteenth Amendment rights; that his counsel was laboring under an actual conflict of interest; that the trial court's refusal to advise the jury regarding consecutive sentences violated his Sixth, Eighth, and Fourteenth Amendment rights; that the denial of a peremptory challenge during jury selection violated his Fourteenth Amendment rights; that the trial court erred in instructing the jury on the "cold, calculated, and premeditated" aggravator in violation of the Ex Post Facto Clause; that he has spent an exorbitant time on death row, which renders any execution cruel and unusual punishment; that he may be incompetent at the time of his execution, which would violate his Eighth Amendment rights; that the state's reliance on the non-statutory aggravator of "future dangerousness" violated his constitutional rights and tainted the validity and reliability of the jury's recommendation; and that Florida's death penalty scheme is unconstitutional in light of *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Following oral argument and a review of the extensive record in this case, I conclude—under a unique legal landscape—that Mr. Muhammad is entitled to relief on his Confrontation Clause claim and that all of his other claims fail.

Put simply, the state violated Mr. Muhammad's Confrontation Clause rights at the 1996 resentencing proceeding when it had an officer testify about the contents of a sworn statement of a witness who had never been cross-examined without first showing that the witness was unavailable or demonstrating that the sworn statement bore indicia of reliability, as required by *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). The state has the burden to show that the *Roberts* violation caused no harm, but the state did not meet this burden. The sworn statement contained evidence at the core of the dispute between Mr. Muhammad and the state—a dispute about Mr. Muhammad's mental state and intent—in the resentencing proceeding. Because the sworn statement was critical, its introduction not only violated the Confrontation Clause, but also prejudiced Mr. Muhammad. Habeas relief as to sentencing is therefore warranted.

## I. THE UNDERLYING FACTS AND PROCEDURAL HISTORY

The state charged Mr. Muhammad with the first-degree murders of Mr. and Mrs. Gans in 1974. The facts with respect to those murders is as follows.

Mr. Muhammad ambushed Mr. Gans as he arrived at his business. *See Knight v. State*, 338 So.2d 201, 202 (Fla.1976) (*Knight I*) (per curiam). As Mr. Gans parked his car, a Mercedes Benz, Mr. Muhammad strode toward him. Mr. Muhammad, who was carrying an automatic rifle, ordered Mr. Gans to get in the car, to drive home, and to get Mrs. Gans. Facing the barrel of a rifle, Mr. Gans obeyed. When he arrived home, Mr. Gans honked the horn. Mrs. Gans walked out, and eventually got into the car. Mr. Muham-

mad then ordered Mr. Gans to drive to the bank, where he demanded that Mr. Gans withdraw $50,000. *See id.*

Mr. Gans went into the bank and warned the bank president about Mr. Muhammad. The bank president alerted the FBI and the police, but Mr. Gans also withdrew the $50,000, carried the money out of the bank, and gave it to Mr. Muhammad.

But Mr. Muhammad did not free Mr. and Mrs. Gans. He forced them, rather, to drive southwest, as far southwest as civilization went in Metropolitan Dade County in 1974. As Mrs. Gans drove, a platoon of law-enforcement officials—composed of FBI agents and Metro–Dade police officers—shadowed the Mercedes Benz in unmarked cars.

Mr. Muhammad commanded Mrs. Gans to stop in a secluded area. Mrs. Gans obeyed. With the Mercedes Benz at rest, the three passengers opened the car doors, stepped out, and loitered for a few moments. For unknown reasons, Mr. Muhammad ordered Mr. and Mrs. Gans back inside the car.

The Mercedes Benz moved and stopped at another spot. Here, Mr. Muhammad shot and killed Mrs. Gans with a bullet to the neck. It is unclear exactly what happened next, but Mr. Muhammad subsequently shot and killed Mr. Gans, also with a shot to the neck. Mr. Gans's body lay a few feet from the car.

The police would soon find the bodies in the wooded area. *See id.* The police combed the area for hours and located Mr. Muhammad nearby. Underneath him— buried in the dirt—the police found an automatic rifle and a bag containing the $50,000. Blood was smeared on Mr. Muhammad's pants. *See id.*

While he awaited trial, Mr. Muhammad escaped from jail. A massive, nationwide manhunt ensued. Mr. Muhammad was eventually recaptured and was tried for the Gans murders in 1975. A jury found him guilty and, after a separate sentencing proceeding, recommended that he be sentenced to death.[3] The trial court followed the jury's recommendation and sentenced Mr. Muhammad to death. Mr. Muhammad appealed, but the Florida Supreme Court affirmed the conviction and sentence in *Knight I.*

Mr. Muhammad then filed a petition for a writ of habeas corpus in the Florida Supreme Court, alleging ineffective assistance of appellate counsel. During the pendency of this habeas proceeding, Florida's governor signed Mr. Muhammad's death warrant. The governor scheduled the execution for March 3, 1981. Mr. Muhammad filed a motion for stay of execution in the Florida Supreme Court. On February 24, 1981, the Florida Supreme Court denied the habeas corpus petition and the motion for stay of execution. *See Knight v. State*, 394 So.2d 997, 1003 (Fla. 1981) (*Knight II* ) (per curiam).

On the day the Florida Supreme Court denied his state habeas petition, Mr. Muhammad filed a petition for writ of habeas corpus and motion for stay in federal district court. The district court granted a stay of execution and retained jurisdiction while Mr. Muhammad returned to state court to exhaust his claims. *See Knight v. Wainwright*, Case No. 81–00391–Civ–Hoeveler (S.D.Fla.1981) (*Knight III* ). Mr. Muhammad then sought amended postconviction relief in the state courts under Florida Rule of Criminal Procedure 3.850. The trial court denied relief, and the Florida Supreme Court affirmed. *See Muham-*

---

3. The advisory sentence does not indicate the numerical vote of the jury for the recommen-

dation for death, other than to state "so say the majority." App. DD, Vol. 16, at 3861.

*mad v. State,* 426 So.2d 533 (Fla.1982) (*Muhammad I*).

After denial of his Rule 3.850 motion, Mr. Muhammad asked that the district court decide his federal petition for writ of habeas corpus. The district court denied the petition, and Mr. Muhammad appealed.

On appeal to the Eleventh Circuit, Mr. Muhammad raised seven claims. *See Knight v. Dugger,* 863 F.2d 705, 707 (11th Cir.1988) (*Knight IV*). As to the first six claims, the Eleventh Circuit was "satisfied that the district court handled each one properly." *Id.* at 707. But his last claim, "concerning restrictions on the consideration of non-statutory mitigating evidence[,] present[ed] a more difficult issue." *Id.* at 708.

The Eleventh Circuit held that an error under *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), was apparent and concluded "that harmless error cannot be made out simply because multiple aggravating circumstances exist in a given case." *Knight IV,* 863 F.2d at 710. The state, moreover, offered no other arguments supporting its contention that the *Lockett* violation was harmless, and so the Eleventh Circuit granted the habeas corpus petition. *Id.* The panel remanded the case to the district court with instructions to enter an order "granting the application for writ of habeas corpus, unless the State within a reasonable period of time either resentences Muhammad in a proceeding that comports with *Lockett* or vacates the death sentence and imposes a lesser sentence consistent with law." *Id.*

Not until 1996—eight years later—did a Florida court finally resentence Mr. Muhammad for the murders of Mr. and Mrs. Gans. By a nine to three vote on both counts, the jury recommended a sentence of death. The trial court agreed with the jury and sentenced Mr. Muhammad to death. The trial court found that six statutory aggravating circumstances applied: (1) Mr. Muhammad was convicted of another capital felony or of a felony involving the use or threat of violence to the person; (2) he kidnapped the victims; (3) he murdered Mr. and Mrs. Gans to avoid arrest; (4) he murdered for pecuniary gain; (5) the murders were especially heinous, atrocious, or cruel; and (6) Mr. Muhammad committed the capital felony in a cold, calculated, and premeditated way without pretense of moral or legal justification. Though it found no statutory mitigating circumstances, the trial court did find three non-statutory mitigators and gave them "weight."[4]

Mr. Muhammad appealed to the Florida Supreme Court, which affirmed, though it found that the trial court had incorrectly applied the heinous, atrocious, and cruel statutory aggravator. *See Knight v. State,* 746 So.2d 423, 435–36 (Fla.1999) (*Knight V*) (per curiam). The United States Supreme Court then denied Mr. Muhammad's petition for writ of certiorari. *See Knight v. Florida,* 528 U.S. 990, 120 S.Ct. 459, 145 L.Ed.2d 370 (1999) (*Knight VI*).

Mr. Muhammad next filed a motion for post-conviction relief in the trial court, asserting 28 claims. The trial court denied Mr. Muhammad's motion without an evidentiary hearing. Mr. Muhammad appealed to the Florida Supreme Court, which affirmed the denial of post-conviction relief. *See Knight v. State,* 923 So.2d 387 (Fla.2006) (*Knight VII*) (per curiam). Mr. Muhammad also filed a petition for a writ of habeas corpus with the Florida Supreme Court, which denied relief. *Id.* at 395.

---

**4.** The trial court found that Mr. Muhammad had been abused as a child, suffered from some mental problem that did not rise to the level of statutory mitigation, and was raised in poverty. D.E. 16 at 48.

In March of 2006, Mr. Muhammad filed this petition for a writ of habeas corpus under 28 U.S.C. § 2254. The state filed its response and memorandum of law in October of 2006, and Mr. Muhammad filed a reply memorandum in April of 2007.

## II. MR. MUHAMMAD'S CLAIMS AND APPLICABLE STANDARDS

Mr. Muhammad's habeas corpus petition is governed by the Anti–Terrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. 104–132, 110 Stat. 1214 (1996) (codified at various provisions in Title 28 of the U.S.Code), which significantly changed the standards of review that federal courts apply in habeas corpus proceedings. Under AEDPA, if a state court adjudicates a claim on the merits, a federal court may grant habeas corpus relief only when the state court's decision "was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1)-(2). This is an "exacting standard." *Maharaj v. Sec'y Dep't of Corr.*, 432 F.3d 1292, 1308 (11th Cir.2005).

■ Under § 2254(d)(1), a state court decision is "contrary to" Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in" Supreme Court opinions. *See Gary v. Hall*, 558 F.3d 1229, 1254 (11th Cir.2009). Only the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision" constitute "clearly established" federal law. *See id.*

■ A state court's decision unreasonably applies clearly established federal law "if the state court identifies the correct governing legal rule but unreasonably applies it to the facts of the particular state prisoner's case." *Reese v. Sec'y Fla. Dep't of Corr.*, 675 F.3d 1277, 1286 (11th Cir. 2012). A state court unreasonably applies clearly established federal law as well where it "unreasonably declines to extend a legal principle from Supreme Court case law to a new context." *Id. See also Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir.2001) (dictating same "unreasonable application" standard).

■ As noted above, § 2254(d)(2) provides an alternative avenue for relief. A federal court may also grant habeas relief if the state court unreasonably determines the facts. "A state court's determination of the facts, however, is entitled to substantial deference" under § 2254(e)(1). *See Maharaj*, 432 F.3d at 1309. Thus, a federal habeas court presumes that a state court's factual findings are correct, and a habeas petitioner must rebut that presumption by clear-and-convincing evidence. *See Hunter v. Sec'y Dep't of Corr.*, 395 F.3d 1196, 1200 (11th Cir.2005).

■ In certain limited circumstances, however, a federal habeas court does not need to give any deference to a state court on an issue of law. Where a state court does not adjudicate the merits of a claim—for instance, when it incorrectly bases a decision on a procedural bar—AEDPA's strict standard of review does not apply to that claim, and a federal court reviews that claim de novo. *See Magwood v. Warden Ala. Dep't of Corr.*, 664 F.3d 1340, 1347 (11th Cir.2011).

## III. THE CONFRONTATION CLAUSE CLAIM

The Sixth Amendment to the U.S. Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. This right applies to state criminal prosecutions as well as federal ones. *See Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

At Mr. Muhammad's resentencing proceeding in 1996, the state offered the testimony of Detective Greg Smith. Mr. Muhammad contends that Detective Smith's testimony, which was based largely on hearsay—e.g., prior testimony, witness reports, and sworn statements—violated those rights guaranteed by the Confrontation Clause of the Sixth Amendment because he was unable to cross-examine the out-of-court declarants. The state argues that this claim is procedurally barred and that, therefore, I cannot address the merits. Unfortunately, it argues little else. As explained below, I disagree with the state's procedural bar argument. And, turning to the merits, I conclude that Mr. Muhammad is entitled to a writ of habeas corpus as to sentencing.

### A. DETECTIVE SMITH'S TESTIMONY

Detective Smith testified at length at the resentencing proceeding. He testified both when the state tried to prove certain statutory aggravators and in the state's rebuttal case. Detective Smith did not testify in the original trial. Nor did he testify in the original sentencing proceeding. In fact, Detective Smith had barely graduated from the police academy when Mr. Muhammad murdered Mr. and Mrs. Gans. Trial Tr., App. FF., at 2343.

In an attempt to prove certain statutory aggravators, the state asked that Detective Smith read portions of Detective Julio Ojeda's testimony. Detective Ojeda had investigated the murders of Mr. and Mrs. Gans and had testified in Mr. Muhammad's original trial. *Id.* at 2345–46. To prove the relevant statutory aggravators, Detective Smith recounted much of Detective Ojeda's investigation and also repeated testimony from other witnesses.

Objecting to this method of evidentiary presentation, Mr. Muhammad requested that, before Detective Smith testify, he identify the source of the information from which he was about to testify. The trial court granted this request.

Despite the request, Detective Smith struggled to identify the source or sources of his testimony. Defense counsel therefore continued to object, and the following exchange ensued.

**Mrs. Weissenborn** [Mr. Muhammad's counsel]: Again, where is this coming from?

**The Court:** Just identify—

**The Witness:** It was testified to at length in Detective Ojeda's Scene and Body Section of his report.

**Mrs. Weissenborn:** Were [*sic*] you are saying Detective Ojeda is the one that testified to this?

**The Witness:** I believe Ojeda as well as Technician Zann testified to it.

**Mrs. Weissenborn:** Your honor, I would like to come sidebar again.

**The Court:** Yes.

. . . .

**Mrs. Weissenborn:** There is a further objection to this process, Your Honor. It is impossible when they are going from testimony in reports to every other place. It is unfair to this defendant, not only for confrontation, it is simply beyond a simple hearsay. This is simply taking—if they had each individual witness here, there would be [ ] fairness. We can take each witness, we can cut down what they are saying. We have the right to impeach. Now we are going from this report to this testimony to that testimony. This is beyond simple hearsay I think the state envisioned.

**The Court:** You seem to distinguish little hearsay, medium hearsay and big hearsay. This you believe to be big hearsay. There is no distinction. Hearsay is hearsay. You are right this is hearsay.

Exactly the same thing was done in Clark versus State which can be found at 613 [Southern Second] 412 whereas concerned the prior convictions rather than bring in what the State did which is to bring in the eyewitnesses to the murder. They brought in a detective who testified about what everybody said at that trial.

The Supreme Court said essentially there is no problem. It was the same thing that they found and held in Waterhouse versus State—these are 1992 cases; these are not ancient cases—596 [Southern Second] 1008. Tompkins versus State, Rhodes versus State.

Again, it is the same thing. I know you do not like it. You have made that clear.

**Mrs. Weissenborn:** I am beyond that at this point. I am also raising due process. This is not a fair process at this point in time, not when he jumped from place to place. You have no right to sit here and the reason we will be able to prepare when you have over 3,600 pages of testimony which he jumps back and forth from. At least in a normal trial, in a normal process you have a right to sit there and you can reasonably hear what is happening and cross-examine. This procedure did not issue that right.

**The Court:** All right. The objection is overruled.

*Id.* at 2386–88. With that ruling, Detective Smith continued with his testimony.[5]

After the state rested, Mr. Muhammad presented evidence of mitigators—that is, reasons for why the state should not obtain the death penalty. He underscored his destitute childhood, a childhood punctuated by his father's cruelty and abuse. He also presented evidence of his mental health. Mr. Muhammad's expert witnesses—psychologists and psychiatrists—

testified that, because of schizophrenia, Mr. Muhammad likely lost his self-control when he discovered the police surveillance during the kidnapping. This loss of self-control then caused Mr. Muhammad to kill Mr. and Mrs. Gans. Mr. Muhammad argued, essentially, that he did not plan out the murders from the start.

The state relied on Detective Smith to rebut the assertion that Mr. Muhammad became aware of any police surveillance. When asked by the prosecutor if any marked police cars followed Mr. Muhammad from the bank to southwest Dade County, Detective Smith testified that "[t]here were absolutely none." *Id.* at 3551.

Another witness, Agent Terry Nelson, had testified in the resentencing proceeding that aircraft—an airplane and a helicopter—dogged Mr. Muhammad during the surveillance too. *Id.* at 2089. To rebut this testimony, Detective Smith testified in rebuttal about the plane and helicopter as well, relying in large part on a sworn statement given to police by the helicopter pilot (who never testified). Detective Smith told the jury that the airplane made no noise. *Id.* at 3552–53. Plus, he testified that neither the airplane nor the helicopter had tracked Mr. Muhammad until *after* he had killed Mr. and Mrs. Gans. *Id.* at 3556–58. When asked if either the airplane pilot or the helicopter pilot saw the Mercedes Benz before it had stopped the second time, Detective Smith answered without prevarication: "No, ma'am." *Id.* at 3562.

## B. Procedural Bar

On direct appeal from the resentencing proceeding, Mr. Muhammad raised a Confrontation Clause/right-to-cross-examination claim. The Florida Supreme Court

---

**5.** Detective Smith did not read all of Detective Ojeda's trial transcripts, but only those portions that the state gave him to read. Trial Tr., App. FF, at 2459.

denied the claim on procedural grounds. According to the Florida Supreme Court, Mr. Muhammad never objected to Detective Smith's testimony about helicopters:

> In his first claim, [Mr. Muhammad] contends that Detective Smith's hearsay testimony violated his right to confrontation, due process, and a reliable sentencing proceeding. The gravamen of [Mr. Muhammad's] claim is that Detective Smith's recounting, on rebuttal, of the helicopter pilot's prior sworn statement violated his Confrontation Clause right to confront and cross-examine witnesses because, unlike Smith's earlier testimony summarizing prior trial testimony, the pilot's statement had never been subjected to adversarial testing and lacked the reliability accorded former testimony. However, because [Mr. Muhammad] never specifically objected to Smith's testifying as to the contents of the pilot's statement, we find this claim procedurally barred.

*Knight V,* 746 So.2d at 429–30.

■■■ Federal courts reviewing petitions for habeas corpus generally honor state procedural bars. *See Smith v. Dep't of Corr.,* 572 F.3d 1327, 1337 (11th Cir. 2009). But a procedural bar must be based on a state-law ground that is "adequate" and "independent of the federal question." *Conner v. Hall,* 645 F.3d 1277, 1287 (11th Cir.2011). Federal law governs whether a procedural bar is adequate, *see Cone v. Bell,* 556 U.S. 449, 465, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009), and under federal law, a procedural bar is "adequate" if it is "firmly established and regularly followed." *Conner,* 645 F.3d at 1288. The state court cannot have applied the bar in "an inconsistent or manifestly unfair manner." *Upshaw v. Singletary,* 70 F.3d 576, 579 (11th Cir.1995). For the reasons which follow, the procedural bar applied by the Florida Supreme Court is inadequate.

■■■ First, contrary to the Florida Supreme Court's factual determination, Mr. Muhammad objected. Before Detective Smith testified, counsel for Mr. Muhammad [6] made the following objection:

> **Mr. Weissenborn:** May it please the Court. My basic objection as to what the State intends to use this witness for which is to come in here give some kind of summary of everything that happened which involves the witness based on his investigation, telling the jury what other people did, what other people said, either over the radio or in person, and the objection I raise is this *violates the rights of—the confrontation rights of the defendant on the Sixth Amendment* and Article 1616, whatever it is, of the Florida Constitution.
>
> I would like to have a standing objection.
>
> **Mrs. Weissenborn:** The best evidence is not the best evidence—the best evidence of Mr. Marinek is the transcript of what Mr. Marinek was asked and answered at that time.
>
> **Mr. Laeser [prosecutor]:** Actually, my belief is that the best evidence rules involve writings.
>
> **The Court:** That is my understanding. *I will accept this objection as a continuing objection for all testimony from this witness referring to what other people told him or anything that is hearsay.*
>
> **Mr. Weissenborn:** My objection is—
>
> **The Court:**—confrontation.
>
> **Mr. Weissenborn:** *There is a confrontation objection and that can't be changed by Statute.* That right would be watered down in the statute. And that would go to any documentary evi-

---

**6.** Mr. Muhammad was represented by both Mr. Lee Weissenborn and Mrs. Sheridan Weissenborn at his 1996 resentencing hearing.

dence. It is not a procedural objection. I didn't see it, any documentary evidence which would violate his confrontation rights. We will object to—

**The Court:** All right. The objection is overruled.

Trial Tr., App. FF, at 2352–53 (emphasis added). Thus, the trial court allowed Mr. Muhammad to have a standing objection to any testimony by Detective Smith based on hearsay, including the testimony based on the helicopter pilot's sworn statement.

Throughout the remaining testimony of Detective Smith, Mr. Muhammad's counsel kept objecting. These objections prompted the trial court to make the following admonishment:

**The Court:** If you find that the officer mischaracterizes what the testimony is, I will let you bring in the whole transcript. We will sit here until doomsday and read it to the jury.

But if the witness can testify in this manner and you do not find that he is saying things that are not true, there is no problem with this procedure. The Supreme Court has repeatedly—*now I don't want to hear the same objection and be brought sidebar for the same objection. This is hearsay. It is hearsay. You made your confrontation rule argument. I have accepted your objection, your [sic ] object to all of it.*

I don't want another sidebar on the subject of hearsay. *You have preserved your record.* I have ruled. The Supreme Court has ruled on this issue.

**Mr. Weissenborn:** Florida Supreme Court?

**The Court:** Yes. Yes. Let's go on.

*Id.* at 2364 (emphasis added).

The transcript thus conclusively shows that Mr. Muhammad had a standing objection to Detective Smith's hearsay testimony. To the extent that the Florida Supreme Court factually determined that Mr. Muhammad had not objected, the transcript constitutes clear and convincing evidence that contradicts such a determination, and I therefore will consider the merits of the Confrontation Clause claim. *See Blanco v. Sec'y Fla. Dep't of Corr.*, 688 F.3d 1211, 1240 (11th Cir.2012) ("Even though Blanco raised this claim in the first possible proceeding following his resentencing, the Florida Supreme Court concluded that Blanco's *Brady* claim was procedurally barred. The District Court should have recognized this error and addressed the merits of the claim.").

Second, Florida law consistently recognizes that a standing objection preserves an issue for appeal. *See, e.g., Floyd v. State*, 850 So.2d 383, 393 n. 20 (Fla.2002) (per curiam); *Hayes v. State*, 660 So.2d 257, 261 (Fla.1995); *Womack v. State*, 855 So.2d 1236, 1237 (Fla.Dist.Ct.App.2003). Indeed, on similar facts, the Florida Supreme Court has twice refused to apply a procedural bar. *See Corona v. State*, 64 So.3d 1232, 1242–43 (Fla.2011) (holding that standing objection preserved Confrontation Clause issue on appeal); *Hopkins v. State*, 632 So.2d 1372, 1376 (Fla.1994) ("[D]efense counsel's 'confrontation rights' objection necessarily called into question whether the statutory procedures had been followed.... Once defense counsel has made a general objection to the admissibility of testimony via closed circuit television on an appropriate legal ground and has been overruled by the trial judge, counsel should not be required to continue arguing over the legal sufficiency of the court's factual basis for its ruling."). Yet it refused to recognize (or simply missed) the standing objection here, which makes the procedural bar inadequate. *See Conner*, 645 F.3d at 1288 ("[W]e hold that the Georgia's procedural default rule is inadequate to bar federal review of Conner's mental retardation claim because it has not been consistently and regularly followed.").

Third, and most damaging, the state judge who presided over the resentencing hearing agreed that Mr. Muhammad had objected to Detective Smith's hearsay testimony. As noted earlier, Mr. Muhammad filed a post-conviction motion under Rule 3.850 after the resentencing. Among his claims, Mr. Muhammad—parroting what the Florida Supreme Court had said in *Knight IV*—argued that his counsel "never specifically objected" to the hearsay testimony that presented "the pilot's statement." *Knight VII*, 923 So.2d at 403. On appeal from the denial of the Rule 3.850 motion, the Florida Supreme Court affirmed and attached "as an appendix the [trial court's] order denying postconviction relief." *Id.* at 392–93. In its order, the trial court denied Mr. Muhammad's claim because Mr. Muhammad's counsel "did object." *Id.* at 403. Thus, the Florida Supreme Court refused to address the Confrontation Clause claim on direct appeal because Mr. Muhammad purportedly did not object, and, when Mr. Muhammad alleged ineffective assistance of counsel in his post-conviction motion for supposedly failing to object, the Florida Supreme Court contradicted itself and denied relief because Mr. Muhammad had indeed objected.

In sum, Florida courts have routinely considered issues on which a party has made a standing objection, have refused to apply procedural bars in similar situations, and have inconsistently (and incorrectly) applied the bar in this very case. In similar circumstances, the Eleventh Circuit has refused to apply a state procedural bar. For instance, in one case, the defendant noted that Florida law allowed him to attack the validity of his plea on collateral review, even if he never challenged the plea on direct appeal. The Florida Supreme Court nevertheless refused to review the argument on collateral review, and the defendant asserted that the Florida Supreme Court's actions were inconsis-

tent and unfair. *See Upshaw*, 70 F.3d at 579. The Eleventh Circuit agreed with the defendant: "[W]e conclude that it was inconsistent and manifestly unfair for the state court to deny the claim based on the procedural ground that it was not presented on direct appeal." *Id.* at 580. *See also Spencer v. Kemp*, 781 F.2d 1458, 1470 (11th Cir.1986) (refusing to uphold procedural bar where the defendant objected but state court applied new statute retroactively so as to make the objection untimely); *id.* at 1473 (Tjoflat, J., concurring) ("Because the issue was seasonably and squarely presented to the trial court, the state contemporaneous objection rule cannot operate to bar review of petitioner's claim."). Hence, I conclude that no procedural bar precludes consideration of the Confrontation Clause claim.

### C. RIGHT TO CROSS-EXAMINATION

The Sixth Amendment generally guarantees a defendant the right to confront all the witnesses against him in a criminal prosecution. Since 1965, this right applies to state criminal prosecutions, for the Fourteenth Amendment incorporated the Sixth Amendment's Confrontation Clause. *See Pointer*, 380 U.S. at 403, 85 S.Ct. 1065. But questions emerge. Does the Confrontation Clause cover sentencing hearings? Or does it only apply to criminal trials? Mr. Muhammad asserts that the Clause applies to capital sentencing proceedings. The state disagrees. As I explain below, Mr. Muhammad is correct given existing Eleventh Circuit precedent.

### 1. STANDARD OF REVIEW

Before I analyze the merits of the Confrontation Clause claim, I must decide what level of review applies. Generally, AEDPA demands that a federal court grant habeas corpus relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established federal law, as deter-

mined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." § 2254(d)(1)-(2). But this deference applies only if the state court actually adjudicated the federal claim on the merits, and the parties agree that the Florida Supreme Court applied a procedural bar under state law to the Confrontation Clause claim, and did not address the merits. "[B]ecause" there is no "state court adjudication" on the merits of the claim, my "review is not subject to the deferential standard that applies under" AEDPA. *Magwood,* 664 F.3d at 1347. *See also Blanco,* 688 F.3d at 1240 n. 9 ("We decide this issue de novo because the Supreme Court of Florida did not make any determination on the merits.' "). In other words, I review Mr. Muhammad's contention anew—i.e., under de novo review. *See Magwood,* 664 F.3d at 1347. This approach is consistent with the Supreme Court's use of plenary review where a state court does not address a claim or issue. *See Cone,* 556 U.S. at 472, 129 S.Ct. 1769 ("Because the Tennessee courts did not reach the merits of Cone's *Brady* claim, federal habeas review is not subject to the deferential standard that applies under AEDPA 'to any claim that was adjudicated on the merits in state court proceedings.' ").

## 2. THE RIGHT TO CROSS-EXAMINATION AT CAPITAL SENTENCING PROCEEDINGS

■ I ultimately conclude, as explained below, that the Confrontation Clause applies in capital sentencing proceedings. I recognize, however, that the legal landscape is a quagmire.

The Supreme Court, in *Williams v. New York,* 337 U.S. 241, 250–51, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), ruled more than 60 years ago that trial courts may consider out-of-court sources when deciding a criminal defendant's sentence, even when, as in *Williams,* the potential sentence is death. The Court repeated this sentiment in *Williams v. Oklahoma,* 358 U.S. 576, 583–84, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959), where it held that, during a capital sentencing proceeding, the court could consider "unsworn or 'out-of-court' information relative to the circumstances of the crime and to the convicted person's life and characteristics."

These cases, however, come from a time before the Confrontation Clause applied to the states and before the Eighth Amendment placed limits on capital sentencing. And since then the Eleventh Circuit, in *Proffitt v. Wainwright,* 685 F.2d 1227, 1254 (11th Cir.1982), has squarely held that "the right to cross-examine adverse witnesses applies to capital sentencing hearings."

Unfortunately, the Eleventh Circuit's more recent jurisprudence in this area is muddled. In *Chandler v. Moore,* 240 F.3d 907, 918 (11th Cir.2001), for instance, one Eleventh Circuit panel rejected a Confrontation Clause claim because "hearsay evidence is admissible at capital sentencing," so long as the criminal defendant has "the opportunity to rebut any hearsay information." *Chandler* is, in my view, in some pretty serious tension with *Proffitt.*[7] But *Proffitt* precedes *Chandler* by nearly 20 years, and under the "prior panel precedent rule" the Eleventh Circuit is "bound

---

7. In *Chandler,* a witness, like Detective Smith, mentioned the trial testimony of another witness at the sentencing proceeding. *See* 240 F.3d at 918. The Eleventh Circuit panel rejected the Confrontation Clause argument because the criminal defendant had ample opportunity to cross-examine the trial witness.

So *Chandler* may be read narrowly as applying an indicia-of-reliability standard and finding no concern with the testimony's reliability. *See id.* But the opinion lacks detail or analysis on the Confrontation Clause issue, and hence its scope is difficult to ascertain.

by earlier panel holdings." *United States v. Smith*, 122 F.3d 1355, 1359 (11th Cir. 1997). Of course, there are limitations to the prior-panel-precedent rule. A holding reaches the facts and the precise issues before the court and no more. *See Chavers v. Sec'y Fla. Dep't of Corr.*, 468 F.3d 1273, 1275 (11th Cir.2006) (per curiam). But the *Proffitt* pronouncement was not dicta, and the facts in *Proffitt* mirror those here.

*Proffitt* was a habeas case in which Charles Proffit claimed that the state court admitted a court-appointed psychiatrist's report without an opportunity for him to confront the psychiatrist at his death-penalty sentencing hearing. The report's introduction, Mr. Proffit maintained, violated the Confrontation Clause. *See Proffitt*, 685 F.2d at 1234. The Eleventh Circuit panel agreed, held that Mr. Proffit had the right to cross-examine the psychiatrist, and granted habeas relief. *See id.* at 1255.

Nor is *Proffitt* deficient analytically. It discusses the relevant Supreme Court cases (e.g., *Williams*), finding them "no longer valid." *Id.* at 1254. As the opinion put it, "[t]he constitutional requirements governing capital sentencing ... have undergone substantial evolution in the wake of *Furman v. Georgia.*" *Id.* at 1252 (citing *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)). That substantial evolution, *Proffitt* held, makes the Confrontation Clause applicable to capital sentencing. *See id.* at 1254.

And, although the prior panel precedent rule does not apply if the Supreme Court or the Eleventh Circuit, sitting *en banc*, overrules an opinion, *Proffitt* has not been overturned. If anything, the Supreme Court has generally *expanded* the Confrontation Clause's application, and nothing suggests that the Supreme Court would overturn *Proffitt* today. *See Davis v. Washington*, 547 U.S. 813, 823–24, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006); *Crawford v. Washington*, 541 U.S. 36, 51–52, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

Finally, I note that—*Chandler* aside—the Eleventh Circuit has consistently noted *Proffitt's* recognition of the Confrontation Clause's applicability at capital sentencing. *See Moore v. Zant*, 885 F.2d 1497, 1512 (11th Cir.1989) (*en banc*) ("In light of that trend, we conclude that, in 1978, reasonably competent counsel reasonably could have anticipated the extension of Sixth Amendment rights, including the right of confrontation, to capital sentencing proceedings."); *United States v. Brown*, 441 F.3d 1330, 1361 n. 12 (11th Cir.2006) ("[D]eath is different, and we have held, in the state habeas context, that the constitutional right to cross-examine witnesses applies to capital sentencing hearings."); *United States v. Cantellano*, 430 F.3d 1142, 1146 (11th Cir.2005) ("[W]e have recognized a right to cross-examination in the context of *capital* sentencing."); *United States v. Sanchez*, 278 Fed.Appx. 927, 929 n. * (11th Cir.2008) (per curiam) ("*Proffitt* recognized a right to cross-examination in the context of capital sentencing."). *Chandler* never cited *Proffitt*, an opinion that preceded it. And *Proffitt*, as Eleventh Circuit law repeatedly indicates, still governs. So *Proffitt* controls, and the right to cross-examination applied to Mr. Muhammad's capital resentencing proceeding.

### 3. Applicable Law

Under Eleventh Circuit precedent, Mr. Muhammad had the right to cross-examine Detective Ojeda, the helicopter pilot, and the airplane pilot. But what does that right entail, exactly? The answer is not a simple one, for the right to cross-examination has changed over the years. As currently interpreted, the right to cross-examination prevents the state from introducing a witness' "testimonial statements" unless

the witness appears at trial or, if the witness is unavailable, "the defendant had a prior opportunity for cross-examination." *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 2531, 174 L.Ed.2d 314 (2009).

But this standard is a modern one which overturned the previous standard expounded in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). *See Crawford v. Washington*, 541 U.S. at 61–65, 124 S.Ct. 1354 (overruling *Roberts* test). Mr. Muhammad's sentencing took place in 1996 (before the Supreme Court overruled the rationale in *Roberts*) but it is now 2012. So I must decide which Sixth Amendment standard applies.

■ Fortunately, the Eleventh Circuit has settled the issue. A federal habeas court applies the Confrontation Clause standard as it existed at the time of the criminal defendant's trial—or, here, the resentencing proceeding. *See Mason v. Allen*, 605 F.3d 1114, 1123 (11th Cir.2010) (per curiam) (applying *Roberts* because the trial and sentencing took place in 1998). The state court sentenced Mr. Muhammad in 1996, so the standard in *Roberts* governs.

### 4. THE RIGHT TO CROSS-EXAMINATION UNDER *ROBERTS*

Under *Roberts*, where the prosecution wants to introduce a witness' statement through a means other than the witness' live testimony, that "statement is admissible only if it bears adequate 'indicia of reliability.'" 448 U.S. at 66, 100 S.Ct. 2531. And, if the prosecution seeks to introduce the statement through prior judicial testimony, then *Roberts* requires the prosecution to "either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Id.* at 65, 100 S.Ct. 2531. *See also United States v. Inadi*, 475 U.S. 387, 397, 106 S.Ct. 1121, 89 L.Ed.2d 390

(1986) ("[B]efore [testimony from a prior judicial proceeding] can be admitted the government must demonstrate that the declarant is unavailable.").

■ Detective Smith read portions of Detective Ojeda's prior trial testimony at the resentencing proceeding. Though the Supreme Court in *Roberts* found that prior testimony bears adequate indicia of reliability, *id.* at 73, 100 S.Ct. 2531, it also required that the state also show that Detective Ojeda was "unavailable" before it allowed Detective Smith to testify based on prior testimony. *See id.* at 65, 100 S.Ct. 2531 ("In the usual case (including cases where prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant."). Though the prosecution need not show "unavailability" for every Confrontation Clause issue, it must do so "when the challenged out-of-court statements were made in the course of a prior judicial proceeding." *White v. Illinois*, 502 U.S. 346, 354, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992). That is the situation here, but the state failed to show, or even assert, Detective Ojeda's unavailability.

A witness is unavailable when the prosecutor makes "good faith efforts to obtain" his "presence at trial" but nonetheless fails. *See United States v. Siddiqui*, 235 F.3d 1318, 1324 (11th Cir.2000). The record here shows no good-faith effort by the state to get Detective Ojeda on the stand. Indeed, Detective Ojeda's absence is mentioned once in the entire proceeding. The state prosecutor asked Detective Smith if Detective Ojeda still worked with the Metro–Dade Police Department, and Detective Smith replied that he did not. Trial Tr., App. FF, at 2345–46. But nothing indicates that Detective Ojeda was ill, dead, living in a different place, or unwilling to

testify despite the state's efforts to produce him. In fact even now, the state does not raise any argument about unavailability. Because the prosecution utterly failed to show a good-faith effort to have Detective Ojeda testify, the trial court violated Mr. Muhammad's right to cross examine Detective Ojeda. *See, e.g., Merolillo v. Yates,* 663 F.3d 444, 454 (9th Cir.2011) ("Dr. Garber no longer worked for the county coroner's office, but the record provides no reason why Dr. Garber's presence could not be obtained nonetheless. He was therefore not shown to have been 'unavailable' for trial.").[8]

Mr. Muhammad also complains about Detective Smith's testimony parroting the sworn statement made to the police by the helicopter pilot.[9] As with Detective Ojeda, nothing in the record suggests that the helicopter pilot was unavailable. The state, moreover, has failed to offer any indicia of reliability as to the pilot's sworn statement. "Reliability can be inferred ... in a case where the evidence falls within a firmly rooted hearsay exception," *Roberts,* 448 U.S. at 66, 100 S.Ct. 2531, but the sworn statement does not fall within any such hearsay exception. At least nothing in the record or in the state's brief hints that it does. Though the state could have attempted to demonstrate reliability by showing that the sworn statement had "particularized guarantees of trustworthiness," it never tried to do this at the resentencing proceeding, and does not try to do so now. Thus, the trial court violat-

ed Mr. Muhammad's right to cross-examine the helicopter pilot when it allowed the prosecution his sworn statement through Detective Smith.

### 5. PREJUDICE/HARMLESS ERROR

 Even though the state court violated his right to cross examination, Mr. Muhammad cannot obtain habeas relief unless the error harmed him. "In habeas proceedings, [courts] review whether a constitutional violation is harmless" under *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), which requires courts to decide "whether the error had substantial and injurious effect or influence in determining the jury's verdict." *Mason,* 605 F.3d at 1123. But it remains the state's burden to show that the constitutional violation is harmless. *See Bonner v. Holt,* 26 F.3d 1081, 1082 (11th Cir.1994) ("Initially we note that when the Supreme Court announced a new standard of review in habeas corpus cases [in *Brecht* ], it did not alter the burden of proving error harmless, which remains with the government.").

Significantly, the state offers no argument whatsoever that the violation was harmless under *Brecht.* Instead, in a blatant misreading of the record, the state maintains that Mr. Muhammad's Confrontation Clause claim is procedurally barred because his lawyers never objected. The record, of course, flatly contradicts this argument.

Despite the clarity of the transcript, the state pushes its procedural-bar argument

---

**8.** As noted, Detective Smith relied on the transcripts of Detective Ojeda's prior trial testimony. Mr. Muhammad, of course, cross-examined Detective Ojeda during his prior testimony. Thus, it may seem odd to find a violation of Mr. Muhammad's right to cross-examine Detective Ojeda. Yet the cross-examination issue here essentially mimics the one in *Roberts,* and the Supreme Court has nevertheless held that a prosecutor must show a good-faith effort to make the witness

available before introducing this type of evidence. *See White,* 502 U.S. at 354, 112 S.Ct. 736.

**9.** Throughout his testimony at the sentencing hearing, the state asked Detective Smith to discuss the helicopter pilot's testimony. Detective Smith, however, specified at one point that the helicopter pilot "did not testify to the jury" but rather "gave a sworn statement." Trial Tr., App. FF, at 3558.

in this habeas proceeding and makes no argument on the merits of Mr. Muhammad's Confrontation Clause claim. The state, rather, focuses on Mr. Muhammad's alternative claim—that his attorneys provided ineffective assistance of counsel when they did not purportedly object to Detective Smith's hearsay testimony.[10] Because it focuses on the ineffective assistance of counsel claim, the state analyzes prejudice under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and ignores prejudice under *Brecht* caused by the introduction of the hearsay evidence. In short, the state has failed to argue that the violation had no substantial and injurious effect or influence on the outcome, and it has therefore forfeited any such argument. *See Owen v. I.C. Sys.*, 629 F.3d 1263, 1274 n. 16 (11th Cir.2011); *Transamerica Leasing, Inc. v. Institute of London Underwriters*, 267 F.3d 1303, 1308 n. 1 (11th Cir.2001) (per curiam); *Pruitt v. PPG Indus.*, 895 F.2d 734, 736 (11th Cir.1990) (per curiam).

This forfeiture principle applies even under AEDPA, as a district court is not required to address harmless error when such an argument is not pressed by the state. *See Prevatte v. French*, 547 F.3d 1300, 1305 (11th Cir.2008) (noting that a district court *may*, on its own initiative, make a harmless-error review where the state does not argue harmlessness). The state's failure to brief the *Brecht* prejudice issue is probably not surprising, since its failure to brief prejudice in *Knight IV* led to Mr. Muhammad obtaining the writ of habeas corpus the first time around. *See* 863 F.2d at 709 ("Since the state offers no arguments to support its contention that the violation of *Lockett* in this case is harmless, relief must be granted."). Just

as capital defendants can abandon arguments and issues by not properly raising them, so can the state. Under the circumstances—including the Florida Supreme Court's failure to undertake any merits analysis—I decline to address harmlessness on my own initiative.

■ Even if the state had not forfeited its prejudice/harmlessness argument, and even if I had to conduct a *Brecht* analysis on my own, I would alternatively find that Mr. Muhammad merits habeas relief on his Confrontation Clause claim. As already mentioned, *Brecht* requires me to decide if "the error had substantial and injurious effect or influence in determining the jury's verdict," with the state bearing the burden on harmlessness. *See Mason*, 605 F.3d at 1123. In the Confrontation Clause context, I look at "the importance of the witness' testimony in the prosecution's case"; "whether the testimony was cumulative" or merely corroborated other evidence; and "the overall strength of the prosecution's case." *Id.* at 1123–24 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). After an independent review of the record, I would alternatively find that Detective Smith's testimony about the helicopter pilot's actions on the day of the murders had a substantial and injurious effect.

To understand why Detective Smith's testimony had a substantial and injurious effect on the verdict, and was not harmless, one must be cognizant of Mr. Muhammad's strategy at the resentencing proceeding. The state, which went first, introduced evidence that Mr. Muhammad had kidnapped Mr. and Mrs. Gans; that Mr. Muhammad had a prior capital felony; that Mr. Muhammad murdered Mr. and Mrs. Gans in a cold, calculated, and premeditated manner; that Mr. Muhammad

10. The state does argue that Mr. Muhammad's attorneys offered effective assistance of counsel because Mr. Muhammad had no right to cross-examine Detective Ojeda and the helicopter pilot. Because of *Proffitt*, however, this argument fails.

murdered to avoid lawful arrest; that Mr. Muhammad killed Mr. and Mrs. Gans for pecuniary gain; and that the murders were atrocious, cruel, and heinous. Mr. Muhammad tried to downplay and/or minimize these potential aggravators through mitigating evidence. He introduced evidence that he came from an impoverished background and that his father was a cruel man who abused him often. But most importantly, Mr. Muhammad introduced evidence of deep-seated psychiatric issues. To do so, Mr. Muhammad called seven mental-health experts to testify on his behalf. These experts testified that Mr. Muhammad had some schizophrenic tendencies, which could cause him to snap if he believed that the police were chasing him. Put differently, Mr. Muhammad's counsel tried to argue that Mr. Muhammad had not, in fact, committed premeditated murder and had not killed Mr. and Mrs. Gans to avoid arrest. Mr. Muhammad, rather, planned a robbery and kidnapping and snapped when he (1) saw the police or (2) heard the police helicopter and then realized that the police were chasing him.

With this in mind, Mr. Muhammad's counsel posed a hypothetical to some of the mental-health experts. The long hypothetical essentially asked whether Mr. Muhammad could have snapped, because of extreme mental and emotional disturbances, when he saw the police or when he heard the aircraft or helicopter. Trial Tr., App. FF, at 2532–37, 2759–66, 2870. The experts answered the hypothetical and said that those stressors would have caused Mr. Muhammad to snap. *Id.* The hypothetical sought to eliminate, or at least diminish, the cold, calculated, and premeditated aggravator, as well as the notion that Mr. Muhammad murdered to avoid lawful arrest. Because the hypo-

thetical depicted the murders as a psychological response from a mentally infirm man, the hypothetical also potentially boosted Mr. Muhammad's mental-health mitigator.

In response, the state argued that Mr. Muhammad was a phony, a man who pretended to suffer from mental issues when he had none. The state introduced the testimony of two mental-health experts, who both opined that Mr. Muhammad did not have schizophrenia. But the state's prime strategy was to show that Mr. Muhammad did not react impulsively to a police pursuit. And, to do so, the state relied on Detective Smith, whose hearsay testimony demolished the hypothetical.

Most of Detective Smith's hearsay testimony did not have a substantial and injurious effect. Detective Smith testified, for instance, that none of the police cars chasing Mr. Muhammad had police identifiers. And, according to Detective Smith's testimony, the police officers following Mr. Muhammad all wore plain, street clothes. Agent Nelson corroborated this testimony fully.[11] He testified, for instance, that no marked police cars followed Mr. Muhammad and that Mr. Muhammad did not look as if the police presence worried him. *Id.* at 2077. Under *Brecht*, then, this part of Detective Smith's testimony was not prejudicial.

Agent Nelson's testimony, with regard to the helicopter, actually favored Mr. Muhammad. When asked about helicopters and airplanes, Agent Nelson stated the following:

**Mrs. Weissenborn:** A helicopter at some point came in?

**Agent Nelson:** A helicopter came in.

**Mrs. Weissenborn:** Where did the helicopter come in?

---

11. That said, much of Agent Nelson's testimony came from the hearsay statements of other officers and agents, testimony to which Mr. Muhammad objected on hearsay and Confrontation Clause grounds. Trial Tr., App. FF, at 2039–40.

**Agent Nelson:** Southwest Dade.

**Mrs. Weissenborn:** Of course the murders took place in Southwest Dade. You mean after the murders, the helicopters were brought in.

**Agent Nelson:** The helicopter was airborne *during the surveillance.*

**Mrs. Weissenborn:** During the procession?

**Agent Nelson:** During the procession.

**Mrs. Weissenborn:** It was not downtown at some point the helicopter got involved?

**Agent Nelson:** To the best of my knowledge, yeah.

**Mrs. Weissenborn:** At what point did it get involved?

**Agent Nelson:** I don't recall.

*Id.* at 2089 (emphasis added).

The state rebutted this evidence, again through Detective Smith's hearsay testimony. Detective Smith made clear, by relying on the helicopter pilot's sworn statement, that Mr. Muhammad could not have possibly seen or heard the helicopter before the murders in part because the pilot was ordered to land. *Id.* at 3554–57. The order to land, moreover, came about because "[t]he officers involved . . . did not want the surveillance . . . being burned." *Id.* at 3556. "That is, they didn't want the helicopter to be seen because of its low altitude and the noise that it makes." *Id.* at 3556–57.

Detective Smith then testified that, according to the helicopter pilot, the first time the pilot saw the car, it had stopped near the canal, i.e., he first saw the car after Mr. Muhammad had shot Mr. and Mrs. Gans. *Id.* at 3558. Mr. Muhammad had "absolutely not" heard the helicopter, according to Detective Smith. *Id.* at 3578. Thus, Detective Smith's hearsay testimony—based solely on the sworn statement of the helicopter pilot—contradicted Agent

Nelson's testimony. Significantly, no other evidence corroborated Detective Smith's testimony with regard to the helicopter and its lack of effect on Mr. Muhammad.

There is no question that the evidence about the helicopter was key. As already noted, the evidence debunked Mr. Muhammad's contention that an impulse caused him to kill Mr. and Mrs. Gans. The evidence also boosted the state's assertion that Mr. Muhammad was a phony who concocted the murders from the start. These different views of the event control (or at the very least significantly affect) whether a person saw Mr. Muhammad's actions as cold, calculated, and premeditated, or saw the murders as an attempt by Mr. Muhammad to avoid lawful arrest.

The attorneys on both sides—who were operating in the crucible of a hotly-contested capital sentencing hearing—well understood the value of the evidence concerning the helicopter. In his opening statement, the prosecutor, for instance, underscored that Mr. Muhammad was unaware of the police surveillance until after he had murdered Mr. and Mrs. Gans. *Id.* at 1912, 1917. The implication, of course, was that Mr. Muhammad killed in a cold, calculated, and premeditated way. *Id.* at 1912.

The prosecutor continued with this theme at closing argument. There, the prosecutor harped on the helicopter's absence and Mr. Muhammad's hypothetical. The prosecutor noted that the hypothetical offered to the mental-health experts assumed that Mr. Muhammad saw marked police cars or saw or heard the helicopter and airplane overhead. "Well, those are not facts," the prosecutor told the jury, because "[t]he facts came out when Detective Smith testified for the second time after going through all the records, all the reports, all the statements, all the testimony about what really happened." *Id.* at 3781.[12] These facts, the prosecutor as-

12. The prosecutor misspoke, for, as Detective Smith acknowledged, he did not read *all* the

sured the jury, proved that the airplane and helicopter did not spot Mr. Muhammad until after he killed Mr. and Mrs. Gans. *Id.* at 3783–84. And, despite Agent Nelson's testimony to the contrary, the prosecutor confidently stated that "the helicopter was not involved in the pursuit or surveillance or anything else." *Id.* at 3784.

In her closing argument, Mr. Muhammad's counsel too discussed the helicopter. She said the evidence showed that Mr. Muhammad stopped once, asked Mr. and Mrs. Gans to get out of the Mercedes Benz, and then forced them back in. The Mercedes Benz stopped at some other spot, where Mr. Muhammad then shot Mr. and Mrs. Gans. Mr. Muhammad's counsel argued that this sequence made sense only if, after the first stop, Mr. Muhammad heard the helicopter and "that caused that break because ... that mind, be it antisocial, be it borderline, be it paranoid schizophrenic," did not act like a healthy mind. *Id.* at 3911.

After closing arguments, the jury, by a vote of nine to three, recommended death for Mr. Muhammad as to both murders. *Id.* at 3935–36. The trial court followed that recommendation and sentenced Mr. Muhammad to death.

The evidence on the issue of premeditation was not one-sided. Agent Nelson testified that Mr. Muhammad did not behave as a man aware of surveillance and that the police worked diligently to keep the surveillance covert. Mr. Muhammad did hide from the police for hours after the murders, which might show design by him. But Agent Nelson lost sight of Mr. Muhammad at times, and Mr. Muhammad did stop the car once, forced Mr. and Mrs. Gans back into the car, and forced them to drive to another spot.

Most importantly, however, the helicopter testimony was vital to the trial court's decision to sentence Mr. Muhammad to death. In large part, the court discarded the testimony of Mr. Muhammad's mental-health experts because "[t]he most significant test for·the expert opinions offered ... are the facts of the case." Sentencing Order, Feb. 20, 1996 at 26. And the hypothetical given by Mr. Muhammad's counsel, the court said, was of little consequence because "[t]he evidence showed that during the pursuit of the Gans vehicle ... there were no police aircraft in the air." *Id.* at 29. According to the court, it was "eminently clear from the evidence that the defendant was unaware of the police presence until after he murdered the Ganses." *Id.* at 30.

The trial court's finding contradicts Agent Nelson's testimony, which implied, if not stated, that the helicopter followed Mr. Muhammad through the procession of events. Detective Smith's hearsay testimony, alone, contradicted Agent Nelson's testimony, and so the court relied on Detective Smith's testimony to discredit Mr. Muhammad's health experts, Mr. Muhammad's hypothetical, and Agent Nelson. If there is any doubt about the importance of Detective Smith's hearsay testimony, the trial court put the doubt to rest. The discrepancy between the facts in the hypothetical and the facts stated by Detective Smith, the court wrote, was *"extremely significant." Id.* at 29 (emphasis added).

There's an additional reason why the hearsay testimony had a substantial and injurious effect and was not harmless. As noted above, the Florida Supreme Court held that the trial court applied the heinous, atrocious, and cruel aggravator when it should not have. *See Knight V,* 746 So.2d

---

records, reports, and statements. He read only those given to him by the state to peruse.

*Id.* at 2459.

at 435. And so this aggravator must be deducted from the prejudice calculation.

Given the weight the trial court gave the discrepancy between Detective Smith's testimony and the facts in the hypothetical, given Agent Nelson's testimony that helicopters had followed Mr. Muhammad during the procession, given the inapplicability of the heinous, atrocious, and cruel aggravator, and given that Mr. Muhammad's awareness of the police pursuit was so central to both the state's case and the defense's case, Detective Smith's hearsay testimony about the helicopter had a substantial and injurious effect on the sentencing proceedings. The state, even if it had not forfeited the argument, cannot carry its burden to show harmlessness.

Finally, and although neither party briefed or mentioned this legal point, I note the following. On direct appeal, the Florida Supreme Court appears to have, in the alternative, suggested a possible harmless error analysis for the claim relating to Detective Smith's hearsay testimony. In whole, the footnote with this suggestion states:

> We also note that the trial court, in considering [Mr. Muhammad's] objection to Smith presenting a summary of former trial testimony, offered [Mr. Muhammad] the opportunity to have that testimony read to the jury as an alternative to Smith's presentation. In addition, Nelson's nonhearsay testimony covered much of the same ground and he participated throughout the surveillance, while the helicopter pilot only became involved at the end. Moreover, while Smith admittedly was called to the stand to rebut the defense's theory that the air surveillance caused [Mr. Muhammad's] loss of mental faculties, his recitation of Detective Ojeda's trial testimony recounted the same subject matter as that presented by Nelson.

*Id.* at 430 n. 8. As I read it, this footnote does not contain any harmless error ruling. There is no identification of *Roberts* as the governing law, no citation to any harmless error standard, and no mention of the word harmless. Assuming, however, that this was somehow an actual harmless-error ruling, it fails even under AEDPA's deferential standard of review.

The ruling was summary in nature, but the Eleventh Circuit has "repeatedly held [that] AEDPA deference is due even if the state court decision was summary in nature." *Pope v. Sec'y Dep't of Corr.*, 680 F.3d 1271, 1295 (11th Cir.2012). "[W]hen a state court on direct review has determined that the alleged constitutional error was harmless under" *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), "a habeas petition cannot be successful unless it satisfies both AEDPA/ *Chapman* and *Brecht.*" *Mansfield v. Sec'y Dep't of Corr.*, 679 F.3d 1301, 1307 (11th Cir.2012).

■ Under *Chapman*, 386 U.S. at 24, 87 S.Ct. 824, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." With AEDPA's gloss, I can grant the writ of habeas corpus only if the Florida Supreme Court's decision that the constitutional error was harmless beyond a reasonable doubt was "objectively unreasonable." *Mitchell v. Esparza*, 540 U.S. 12, 18, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003). I need not, however, undergo the AEDPA/ *Chapman* analysis with regard to Detective Smith's testimony of unmarked police cars and street-clothes—wearing police officers, for I found no prejudicial error as to those matters under *Brecht.* And, where there is no error under *Brecht,* a court need not undergo a harmless-error analysis under AEDPA/ *Chapman.* See *Mansfield,* 679 F.3d at 1307.

Yet, with regard to Detective Smith's testimony based on the helicopter pilot's sworn statement, the Florida Supreme Court's purported harmless-error analysis does not withstand scrutiny, even under the deferential standards in AEDPA.

First, the Florida Supreme Court violated the dictates of *Roberts* and *White*. The Florida Supreme Court stated that the trial court offered to have Detective Ojeda's trial testimony read into the record, rather than restated by Detective Smith. The introduction of the transcript, the Florida Supreme Court presumed, would have cured any harm. But both *Roberts* and *White* make clear that the state must show a witness to be "unavailable" *before* the state can introduce a transcript of that witness' prior testimony as evidence. *See White*, 502 U.S. at 354, 112 S.Ct. 736; *Roberts*, 448 U.S. at 65, 100 S.Ct. 2531. A state court decision, moreover, is "contrary to" Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in" Supreme Court opinions, which is what the Florida Supreme Court did here. *See Gary*, 558 F.3d at 1254. In any event, the testimony regarding the helicopter came not from Detective Ojeda's trial testimony but from a sworn statement that the helicopter pilot gave to the police. The Florida Supreme Court's contrary statement was an unreasonable determination of the facts.

Second, the Florida Supreme Court incorrectly (and unreasonably) found use of the helicopter pilot's statement harmless on the understanding that Agent Nelson's testimony covered the same evidence. The record flatly contradicts the Florida Supreme Court's finding. As already mentioned, Agent Nelson testified that the helicopter joined during the surveillance or during the procession. Later on, Agent Nelson said he did not recall when the helicopter appeared. This hardly displaces Mr. Muhammad's theory or hypothetical. By contrast, Detective Smith's testimony left no doubt that the helicopter did not arrive until *after* Mr. Muhammad killed Mr. and Mrs. Gans. Again, no other evidence supports Detective Smith's testimony. *Cf. Ventura v. Fla. Attorney Gen.*, 419 F.3d 1269, 1286 (11th Cir.2005) ("Its conclusion ... was not 'objectively unreasonable' in light of the extensive and powerful corroborating evidence introduced and the substantial impeachment ... at trial."). Thus, the Florida Supreme Court's finding of harmless error was—if that is what it was—objectively unreasonable. *See Satterwhite v. Texas*, 486 U.S. 249, 260, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) (finding error where improperly admitted testimony was unequivocal, emphasized by the prosecutor, and uncorroborated); *Zappulla v. New York*, 391 F.3d 462, 474 (2d Cir.2004) (finding state court's harmless-error analysis to be objectively unreasonable where the improperly admitted evidence was critical and was emphasized by prosecutor). *Cf. Tuggle v. Netherland*, 516 U.S. 10, 13–14, 116 S.Ct. 283, 133 L.Ed.2d 251 (1995) (per curiam) (finding that death sentence should be set aside where an aggravator was held invalid and another aggravator remained because existence of a valid aggravator does not necessarily excuse constitutional error in the admission of evidence); *Grossman v. McDonough*, 466 F.3d 1325, 1340 (11th Cir. 2006) (finding state court's harmless-error analysis objectively reasonable where, unlike here, the out-of-court statements that supposedly violated the criminal defendant's Confrontation Clause rights were duplicated by the testimony of three other witnesses).

## IV. THE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

In the context of a capital case like this one,

[i]neffective assistance under *Strickland,* is deficient performance by counsel resulting in prejudice, with performance being measured against an "objective standard of reasonableness," "under prevailing professional norms." [A court] ... looks to norms of adequate investigation in preparing for the sentencing phase of a capital trial, when defense counsel's job is to counter the state's evidence of aggravated culpability with evidence in mitigation. In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to "counsel's perspective at the time" investigative decisions are made, and by giving a "heavy measure of deference to counsel's judgments."

*Rompilla v. Beard,* 545 U.S. 374, 380–81, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (citations omitted). Prejudice exists if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 390, 125 S.Ct. 2456. Mr. Muhammad must establish both deficient performance and prejudice. *See, e.g., Dill v. Allen,* 488 F.3d 1344, 1354 (11th Cir. 2007).

Mr. Muhammad asserts that his counsel was ineffective in various ways relating to his 1996 resentencing hearing. Each ineffectiveness claim is addressed below.

## A. FAILURE TO OBJECT

In an admittedly circular argument, Mr. Muhammad contends that his counsel were ineffective for failing to object to the admission of the hearsay testimony that he claims violated his rights under the Confrontation Clause. Mr. Muhammad understandably asserts this claim because on direct appeal the Florida Supreme Court held that he "never specifically objected to Smith's testifying as to the contents of the pilot's statement" and found the claim "procedurally barred." *Knight V,* 746

So.2d at 430. But when Mr. Muhammad raised this claim as one of ineffective assistance of counsel for failing to object, the court denied his claim and determined that the "[d]efendant did object to Detective Smith testifying about the statements of the other witnesses." *Knight VII,* 923 So.2d at 403 (appendix containing trial court's order).

As noted earlier, counsel for Mr. Muhammad did assert, and were granted a continuing Sixth Amendment objection, to Detective Smith's testimony. Mr. Muhammad does not therefore merit relief on this claim.

## B. FAILURE TO RESENTENCE MR. MUHAMMAD IN A REASONABLE PERIOD OF TIME

In 1988, the Eleventh Circuit granted Mr. Muhammad's first federal habeas petition. In its opinion, the Eleventh Circuit ordered a resentencing hearing within "a reasonable period of time." The state, however, did not resentence Mr. Muhammad until 1996—eight years later.

This lag, Mr. Muhammad asserts, is not reasonable, and made evidence stale, witnesses unavailable, and evidence disappear. The state, Mr. Muhammad further claims, used this unreasonable delay as a strategic advantage and prevented him from producing certain witnesses. Plus, the delay forced the trial court to discredit certain testimony because those witnesses had not seen or (in the case of mental health experts) interviewed Mr. Muhammad in years. His counsel, Mr. Muhammad contends, never objected to this unreasonable delay, and therefore rendered ineffective assistance of counsel in violation of the Sixth Amendment.

The trial court found this claim "procedurally barred in as much as the issue of delay was raised on appeal and rejected by the Supreme Court where the Court found that both parties bear the responsibility

for the long delay." *Knight VII*, 923 So.2d at 398. The trial court also found that even if this claim was not procedurally barred

> the delay was partially caused by the defendant. New counsel had been appointed and sought continuances to prepare, requested competency hearings, failed to cooperate with some appointed experts, litigated payments of expert bills against the County, and resisted and failed to provide discovery. Clearly since the defendant contributed to the delay, he cannot now complain about it.

*Id.* The Florida Supreme Court affirmed. It found that this claim was procedurally barred and attached as an appendix the order denying post-conviction relief rather than repeating in detail those reasons in the order. *Id.* at 391.

Initially, the trial court, in the Rule 3.850 proceedings, found that Mr. Muhammad had raised this issue on direct appeal and that it was rejected by the Florida Supreme Court. This finding was incorrect. Mr. Muhammad argued that prolonged incarceration on death row constituted cruel and unusual punishment, but not that the delay in resentencing prejudiced him because of lack or loss of evidence. *See Knight V*, 746 So.2d at 437 ("Finally, Knight claims that to execute him after he has already endured more than two decades on death row is unconstitutionally cruel and unusual punishment."). This distinction is important in considering whether this claim is now procedurally barred from federal habeas review.

But the trial court, in the alternative, decided this issue on the merits. I thus review the state court's adjudication under AEDPA's deferential standard of review. The Florida Supreme Court, in my view, correctly rejected Mr. Muhammad's ineffective assistance of counsel claim on the failure to be resentenced in a reasonable period.

To prevail on a claim of ineffective assistance, a petitioner must demonstrate both that his attorney's efforts fell below constitutional standards, and that he suffered prejudice as a result. *See Strickland*, 466 U.S. at 687–88, 691–92, 104 S.Ct. 2052. Review of counsel's conduct is to be deferential. *See Spaziano v. Singletary*, 36 F.3d 1028, 1039 (11th Cir.1994). Courts may not just second guess the attorney's performance. *See White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir.1992) ("Courts ... should at the start presume effectiveness and should always avoid second guessing with the benefit of hindsight."). Because a "wide range" of performance is constitutionally acceptable, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

█ Before resentencing, Mr. Muhammad made no less than twenty motions that requested or necessitated extensions of time. Mr. Muhammad now claims that his counsel were ineffective for failing to object to the state using the loss of or inability to produce certain evidence to its advantage. But certain of the delays over the eight-year period between the Eleventh Circuit's remand and Mr. Muhammad's resentencing should be attributed to Mr. Muhammad. Repeatedly, Mr. Muhammad's counsel requested continuances, because (understandably, given the case's history) more time was needed for preparation. Thus, any objection to the untimely nature of resentencing would have lacked merit, and his counsel cannot be ineffective for failing to raise a non-meritorious argument. *See Chandler*, 240 F.3d at 913–14.

█ In addition, the record also shows that Mr. Muhammad was not prejudiced by the failure to object. *See Devier v.*

*Zant,* 3 F.3d 1445, 1451 (11th Cir.1993) (per curiam). Mr. Muhammad contends that the trial court gave little weight to his mental experts because they had not seen or evaluated Mr. Muhammad on or near the date of the crime. Thus, the long delay, Mr. Muhammad believes, prejudiced his witnesses' credibility in the trial court's eyes.

But this misunderstands the trial court's concerns. The court did worry that all the mental-health experts evaluated Mr. Muhammad years before or after the date of the crime. The delay in evaluation, however, was not caused by the delay in resentencing. As the court noted, most of these evaluations occurred years before the resentencing hearing—including one evaluation that happened years before the murder—but nonetheless occurred years after (or before) the crime. It is thus unclear how, exactly, the delay caused any prejudice. Mr. Muhammad's claim fails because there simply is no indication that counsel's failure to object to the delay rendered Mr. Muhammad's trial "fundamentally unfair" or that "there is a reasonable probability that, but for counsel's unprofessional errors the result of the proceeding would have been different." *Devier,* 3 F.3d at 1451. *See also Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

### C. FAILURE TO ADEQUATELY INVESTIGATE AND PREPARE MITIGATION

██ Mr. Muhammad argues that his counsel failed to adequately prepare for, and investigate, the mitigation side of the resentencing proceeding. His counsel supposedly did not give mental health providers "critical and relevant materials," such as Mr. Muhammad's prison records, trial transcripts, and reports from other mental health providers who had conducted earlier evaluations. His attorney allegedly failed to provide evidence of Mr. Muhammad's living conditions as a child, including his time spent at home and in the custody of the Okeechobee Boy's School. Finally, his lawyers did not raise certain objections or move to strike certain witnesses' testimony because they were unaware of the proper standards for statutory mitigation. D.E. 1 at 28–43.

The trial court in the Rule 3.850 proceeding found that Mr. and Mrs. Weissenborn had not rendered deficient performance by failing to investigate and prepare mitigation. As the court explained, the record reflected that Mr. Muhammad's counsel called numerous mental health experts to testify. And the jury was presented with evidence of Mr. Muhammad's "mental illness and bizarre behavior and upbringing." *Knight VII,* 923 So.2d at 399. The court found that his claims were either facially insufficient and conclusory or not supported by the record. *See id.* at 392. The Florida Supreme Court agreed with the trial court. That court found that these claims were "properly denied without an evidentiary hearing because they are conclusively refuted by the record." *Id.* at 392 n. 7.

Mr. Muhammad is not entitled to habeas relief on this claim. The Eleventh Circuit has held that failure to make *any* preparations for the penalty phase of a capital murder trial deprives a client of effective assistance of counsel. *See Blake v. Kemp,* 758 F.2d 523, 533 (11th Cir.1985). But the Florida Supreme Court reasonably concluded that this was not the case here. At resentencing, defense counsel called seven mental health experts who testified as to Mr. Muhammad's mental state. And several other witnesses, including two of Mr. Muhammad's sisters, testified about Mr. Muhammad's troubled childhood. The Florida Supreme Court's ruling was not contrary to, and did not involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court. Nor was it based on an unreason-

able determination of the facts in light of the evidence presented.

### D. FAILURE TO PREPARE TO REBUT STATE'S AGGRAVATING FACTORS

■■■ The state introduced evidence that Mr. Muhammad had been convicted of a capital felony. *See* Fla. Stat. § 921.141(5)(b) (evidence of another or prior capital felony is an aggravating factor). The state did so by showing that Mr. Muhammad had murdered a prison guard. Mr. Muhammad killed this prison guard, however, after the state convicted him of murdering Mr. and Mrs. Gans. Mr. Muhammad's attorneys therefore objected to the state introducing this felony as a prior capital felony. Mr. Muhammad now asserts that his attorneys argued this legal issue without proper preparation. Had his attorneys prepared, he says, they could have blocked the state's reliance upon that other capital conviction as an aggravator. But they did not, and so he claims they provided ineffective assistance of counsel.

The trial court, in the Rule 3.850 proceeding, found that Mr. Muhammad's claim was "without merit, as the [other] conviction was valid and counsel cannot be ineffective for failing to challenge a valid conviction." *Knight VII,* 923 So.2d at 404. Further, the trial count found that, as to the claim that his counsel failed to present evidence in rebuttal of Mr. Muhammad's psychological state at the time Mr. Muhammad murdered the prison guard, this evidence was presented at resentencing. The trial court also concluded that all other remaining allegations in this claim were conclusory in nature and failed to plead specifically any prejudice sufficient to warrant an evidentiary hearing. The Florida Supreme Court summarily concluded that this claim was "without merit as a matter of law." *Id.* at 393.

Mr. Muhammad is not entitled to habeas relief on this claim either. After a careful review of the record, I find that the Florida Supreme Court's ruling was not contrary to, and did not involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court. Nor was it based on an unreasonable determination of the facts in light of the evidence presented.

I too find this claim to be without merit. In *Rompilla v. Beard,* 545 U.S. 374, 385–86, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), the United States Supreme Court outlined what constitutes "reasonable efforts" by defense counsel when the prosecution seeks to admit a conviction as evidence of an aggravating factor. "Reasonable efforts certainly included obtaining the Commonwealth's own readily available file on the prior conviction to learn what the Commonwealth knew about the crime, to discover any mitigating evidence the Commonwealth would downplay, and to anticipate the details of the aggravating evidence the Commonwealth would emphasize." *Id.* at 385–86, 125 S.Ct. 2456. Here, counsel for Mr. Muhammad vigorously cross-examined the witnesses who testified about the prison-guard conviction and the "precipitating stressors" that Mr. Muhammad now claims his counsel failed to use and investigate. Trial Tr., App. FF, Vol. 26. Hence, the record indicates that defense counsel undertook "reasonable efforts"— it shows, in fact, that the attorneys were well-versed in the contents of the reports from the correctional facility where Mr. Muhammad murdered the prison guard. In short, I agree with the Florida Supreme Court on this issue.

### E. FAILURE TO ZEALOUSLY ADVOCATE

■■■ The final *Strickland* claim by Mr. Muhammad is that his counsel failed to zealously advocate on his behalf. Although Mr. Muhammad makes this blanket heading in his petition, he fails to point to any specific instances of underwhelming

advocacy. Instead, he baldly asserts this claim as the entirety of his argument. As I have previously ruled above on his first four sub-claims, the remaining miscellaneous claims asserted by Mr. Muhammad under the heading of ineffective assistance of counsel will be addressed here. In addition to the specific claims in Section IV, A–D, Mr. Muhammad also asserts that his counsel failed to file a motion for change of venue, failed to properly prepare the experts witnesses scheduled to testify at the competency hearing, failed to request an instruction on merging the aggravators, impermissibly "opened the door" to the fact that Mr. Muhammad was on "death row," and ineffectively posed a very lengthy hypothetical to the defense experts on direct examination.

The trial court found that Mr. Muhammad failed to assert that "there was a reasonable probability that the news coverage affected the outcome of the trial." The court concluded that the claim was "facially insufficient as conclusory allegations are insufficient to state a claim for relief." As to the claim that mental health experts were not properly prepared by counsel, the trial court found this claim facially insufficient and conclusory because Mr. Muhammad failed to state how additional materials would have changed the testimony of the experts or how the outcome would have been different. The trial court reached a similar conclusion as to Mr. Muhammad's merger claim, finding that Mr. Muhammad failed to allege how the merging instruction could have changed the outcome. Thus, Mr. Muhammad made conclusory allegations, the trial court found, insufficient to warrant an evidentiary hearing. With regard to Mr. Muhammad's claim that his counsel opened the door, the trial court again found that argument conclusory and insufficient to support an evidentiary hearing. Finally, the trial court, applying *Strickland*, determined that Mr. Muhammad counsel's pres-

entation of the lengthy hypothetical was not unreasonable.

The Florida Supreme Court summarily affirmed the trial court's rulings on these issues. It concluded that the assertions were either facially or legally insufficient as alleged or without merit as a matter of law. *See Knight VII*, 923 So.2d at 393. I concur. Mr. Muhammad's sub-claims here are also facially insufficient and/or without merit.

Ultimately, Mr. Muhammad seems to be making a cumulative error claim. Although I have engaged in a sub-claim by sub-claim analysis and have found each to be without merit, unless the trial was rendered fundamentally unfair, the Eleventh Circuit Court of Appeals has declined to validate "cumulative error" claims. *See Cargill v. Turpin*, 120 F.3d 1366, 1386–87 (11th Cir.1997). Mr. Muhammad sub-claims are therefore denied.

## V. THE *BRADY* AND *GIGLIO* CLAIMS

■ Mr. Muhammad next argues that the state never disclosed evidence of his state of mind and of the events that led to the murder of the prison guard. Mr. Muhammad cites to multiple pieces of evidence regarding his mental state at the time of Officer Burke's death, including that Mr. Muhammad "had a different look than he did before" and "was in his cell pacing back and forth and talking to himself." Mr. Muhammad argues that the state withheld this and similar information and hence violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), which dictate when the prosecution must provide certain evidence to the defendant. Additionally, Mr. Muhammad argues that the prosecutor failed to alert the court when a State witness gave false testimony.

In the proceedings related to Officer Burke's murder, Mr. Muhammad did not raise these *Brady* claims on direct appeal. Mr. Muhammad made these claims, rather, when he initially sought post-conviction relief for the murder of Officer Burke. *See Muhammad v. State,* 603 So.2d 488, 488–89 (Fla.1992). The Florida Supreme Court reversed the trial court's denial of Mr. Muhammad's request for an evidentiary hearing on his *Brady* claim and remanded with instructions to conduct an evidentiary hearing on the issue. *See id.* The Florida Supreme Court issued this order four years in advance of Mr. Muhammad's resentencing in this case.

At Mr. Muhammad's resentencing for the Gans murders, the state sought to introduce evidence of the murder of Officer Burke. Mr. Muhammad was resentenced, and on direct appeal to the Florida Supreme Court, Mr. Muhammad did not raise the *Brady* claim, despite knowing of the state's alleged violation for years. *See Knight V,* 746 So.2d at 429 n. 6. Mr. Muhammad made this claim to the trial court in his Rule 3.850 proceeding after his resentencing, and the court denied his claim, finding that "defendant cannot now claim the state withheld information concerning his state of mind and moreover, this information was available to the defendant prior to resentencing." On appeal of this denial, the Florida Supreme Court found that this claim was procedurally barred and facially or legally insufficient as alleged. *See Knight VII,* 923 So.2d at 392 nn. 6–9.

The Florida Supreme Court correctly found the *Brady* claim procedurally barred. Mr. Muhammad knew of the alleged *Brady* violations years before the trial court resentenced him, yet he did not timely raise the issue. Florida courts have applied this procedural bar in a similar situation before. *See Pittman v. State,* 90 So.3d 794, 818 (Fla.2011) (finding, in a Rule 3.850 appeal, that *Brady* claim barred for not being raised before). As a result, Mr. Muhammad's *Brady* claim is procedurally barred. *See Spencer v. Sec'y Dep't of Corr.,* 609 F.3d 1170, 1179 (11th Cir. 2010) ("There is no doubt that, under Florida law, a claim is procedurally barred from being raised on collateral review if it could have been, but was not, raised on direct appeal.").

■■■■■ What's more, Mr. Muhammad's *Brady* claim fails on the merits. In *Brady,* the Supreme Court established three criteria a criminal defendant must prove in order to establish a violation of due process resulting from the prosecution's withholding of evidence. The defendant alleging a *Brady* violation must demonstrate: "(1) that the prosecution suppressed evidence, (2) that the evidence suppressed was favorable to the defendant or exculpatory, and (3) that the evidence suppressed was material." *United States v. Severdija,* 790 F.2d 1556, 1558 (11th Cir.1986). Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Stewart,* 820 F.2d 370, 374 (11th Cir.1987) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). *Giglio,* 405 U.S. at 153, 92 S.Ct. 763, for its part, bars "deliberate deception of a court and jurors by the presentation of known false evidence" by the prosecution. Under *Giglio,* the prosecution must disclose evidence about a witness's credibility, though a new trial is not required where the evidence not disclosed did not "in any reasonably likelihood" affect "the judgment of the jury." *Id.* at 154, 92 S.Ct. 763.

■■■■ I conclude that Mr. Muhammad is not entitled to habeas relief on the *Brady/Giglio* claims. With regard to the ar-

gument that exculpatory evidence was withheld from him, Mr. Muhammad appears to concede that his counsel did have access or knowledge of the existence of such evidence, but says that, because the state did not expressly provide this information, the state violated the disclosure requirement of *Brady.* D.E. 1 at 56–57. In support of this argument, Mr. Muhammad cites to *Strickler v. Greene,* 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), but his reliance on *Strickler* is misplaced. In *Strickler,* the state had an "open door" policy regarding the prosecutor's files such that defense counsel had access to the entire file. It was later determined, however, that the state had failed to disclose five pertinent documents containing exculpatory statements made by a key witness for the prosecution. This constituted the *Brady* violation regardless of the fact that the prosecutor himself had never seen the five documents. *See id.* at 275, 119 S.Ct. 1936. For Mr. Muhammad to assert that *Strickler* stands for the broad assertion that "the United State Supreme Court made clear that even if exculpatory material is available to trial counsel, but not provided, the state has violated the disclosure requirement of *Brady* " is simply an incorrect interpretation of *Strickler.* Plus, having read the petition and the underlying record at length, I am unclear as to what specific evidence (and the source of such evidence) was withheld from Mr. Muhammad. The record clearly shows counsel's full knowledge and awareness of the statements that Mr. Muhammad now complains. Without more detailed and specific allegations, I cannot find that the state violated *Brady.* In any event, the Eleventh Circuit has held that there is no *Brady* violation where, despite non-disclosure, the defendant is aware of the information. *See, e.g., Blanco,* 688 F.3d at 1243.

Further, Mr. Muhammad's claim that the state failed to alert the trial court, the defense, and the jury that a state witness gave false testimony in violation of *Giglio* is conclusory. After making this claim in his petition, Mr. Muhammad fails to identify the false statement or even disclose the name of the witness who allegedly gave false testimony. I cannot evaluate the merits of, or grant relief on, the *Giglio* claim.

## VI. THE IMPROPER PROSECUTORIAL ARGUMENT CLAIM

Mr. Muhammad argues that the prosecutor's inflammatory and improper comments and arguments rendered his death sentence fundamentally unfair and unreliable in violation of his Sixth, Eighth, and Fourteenth Amendment rights. Mr. Muhammad also argues that his attorneys failed to object to these comments. This failure to object, he says, denied him of his right to effective assistance of counsel.

The state, Mr. Muhammad contends, informed the jury through cross-examination of his expert witness that he had lost all his appeals, that he had sought (and was denied) clemency from the Governor, and that a previous jury had rejected his insanity defense. Mr. Muhammad also contends that the prosecutor misled the jurors by asking a hypothetical to an expert witness. The hypothetical raised the specter of rape, arson, and cruelty to animals—actions associated with an antisocial personality disorder that Mr. Muhammad supposedly has. Mr. Muhammad further argues that the prosecutor attacked the integrity of anyone who spoke or testified on his behalf, including the suggestion that one of the lawyers who represented him at his clemency hearing "spread her legs during an interview and allowed Mr. Muhammad to look up her dress." And the prosecutor commented that Mr. Muhammad "didn't believe in the moral law," "was the worst of the worst," "was beyond hope of rehabilitation," "was evil," and had "no feelings

for others, no conscience whatsoever." These comments, Mr. Muhammad contends, made the trial fundamentally unfair. D.E. 1 at 60–70.

On direct appeal, the Florida Supreme Court found that these matters were procedurally barred because "none of these arguments were raised in the trial court." *Knight V,* 746 So.2d at 433. It nonetheless went on to find that, even had these issues been preserved, it would still have found no error. The Florida Supreme Court did find one comment by the prosecutor—that the value of Mr. Muhammad's life was less than the victim's—was improper but not "egregious enough to warrant voiding of the entire proceeding." *Id.*

Mr. Muhammad again raised these claims in his Rule 3.850 proceeding. He did so in two ways: (1) alleging that his counsel was ineffective for failing to object to the comments; and (2) that it was error for the prosecutor to have made the comments and arguments. The trial court determined that Mr. Muhammad's claim was "insufficient in that [Florida] the Supreme Court in its opinion indicated that even if the issue was properly preserved, the Court would still find no error." *Knight VII,* 923 So.2d at 404. On appeal, the Florida Supreme Court found this claim procedurally barred and without merit. *See id.* at 392–93.

I have reviewed the questions complained of by Mr. Muhammad that were posed by the prosecutor to the expert witnesses. Certain of these questions were properly objected to by defense counsel and were preserved for appellate review. Therefore, they were and are not procedurally barred. On the other hand, certain of the questions were not objected to and were properly procedurally barred from review by the Florida Supreme Court.

Regardless, I find these claims to be without substantive merit and refrain from a procedural-bar analysis, opting to resolve the merits first. *See Lambrix v. Singletary,* 520 U.S. 518, 525, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997).

During the state's closing argument, the prosecution argued as follows:

He is angry, hostile, belligerent, suspicious, just like every doctor said, and when he gets angry he does what he wants without a conscience.

Who is this man? He does not abide by moral or legal laws. People often, when they talk about a bad criminal, they say oh, he is like an animal. He is like a beast. That is not true.

Beasts and animals don't kill their own species. They don't kill because it feels good or like the idea. They may kill in self-defense. They may kill for food but they don't go hunting their own species so that they can execute them and get away with what they have done.

. . . .

What he does, he is an angry, mean, ornery prisoner and he decides he is going to take out his revenge. This is a fair trade. "You did not give me a visit, I am going to kill somebody."

In his mind, that is okay. After all, we are dealing with somebody who has no conscience, no moral values.

. . . .

But the big decisions really is, does his life have more value than Sidney Gans's, more value than Lillian Gans's, more value than Richard Burke's?

How do we value these lives? There were no hearings with jurors to evaluate aggravating and mitigating factors for these three innocent victims.

. . . .

He is incapable of being rehabilitated. [His sister] becomes a certified nurse. He wastes the God given intelligence that he has.

She gets him a job in Miami. He uses the money to buy heroin and LSD. She

becomes good and moral; he becomes hostile and evil.

Trial Tr., App. FF, Vols. 33–34.

At the conclusion of the state's closing argument, counsel for Mr. Muhammad made a motion for mistrial. The trial court denied the motion.

 "The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). "Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Id.* at 181, 106 S.Ct. 2464. Under this standard of review and in conjunction with the deference I must give the Florida Supreme Court's determination pursuant to AEDPA, Mr. Muhammad's claim fails.

Some of the prosecutor's comments during closing argument are improper and have no place in a capital sentence proceeding. Still, the Florida Supreme Court found that these comments, though partially improper, did not warrant resentencing. *See Knight V,* 746 So.2d at 433. Under AEDPA's forgiving standard, I cannot find that the Florida Supreme Court erred. In fact, the Supreme Court and the Eleventh Circuit have refused to grant a writ of habeas corpus in cases where prosecutors have made similarly contemptible comments. *See, e.g., Darden,* 477 U.S. at 195, 106 S.Ct. 2464 (Blackmun, J., dissenting) (noting that Supreme Court denied claim for improper prosecutorial argument

where prosecutor said that he wished he could blow defendant away with a shotgun); *Reese,* 675 F.3d at 1283–84 (noting comments that crime was a "woman's worst nightmare," that defendant was a "vicious dog," and that jury should show defendant same mercy he had shown victim).

The closing argument, furthermore, did not "manipulate or misstate evidence, nor did it implicate other specific rights of the accused such as the right to counsel or to remain silent." *Darden,* 477 U.S. at 182, 106 S.Ct. 2464. And prior to closing statements, the trial court advised the jury that "[w]hat the attorneys say is not evidence. Again its purpose is only to give you a perspective on what you have seen and what you have heard." Trial Tr., App. FF, at 3767. This instruction helps to reduce any possible harm. *See Darden,* 477 U.S. at 182, 106 S.Ct. 2464. The issue would be a closer one if review was plenary, but a federal habeas court is not to substitute its views for those of state courts under AEDPA because "an unreasonable application is different from an incorrect one." *Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). The Florida Supreme Court's decision is not an unreasonable application of federal law, and I therefore deny Mr. Muhammad's claim.

## VII. THE CONFLICT OF INTEREST OF COUNSEL CLAIM

"I have had meetings with him and concluded that I couldn't deal with this guy." Trial Tr., App. FF, at 1991. This statement by counsel, and others, form the basis for Mr. Muhammad's claim that his counsel labored under an actual conflict of interest while representing him.[13] His de-

---

13. Mr. Muhammad argues in his petition that "defense counsel was actually afraid of [his] mental illness and told the court that he did not want his wife, co-counsel, in the same room with Mr. Muhammad (11/4/91 hearing at R. 1986)." D.E. 1 at 71. I have reviewed

the transcript from the November 4, 1991, hearing and don't find this statement to have been made. Further, the record citation provided by Mr. Muhammad is not from the November 4, 1991, hearing. Nor does this statement appear on the correct page of the

fense counsel, Mr. Muhammad argues, had to balance their own fears of Mr. Muhammad's mental illness against the ethical obligation to zealously and loyally represent their client. This balance, Mr. Muhammad asserts, was untenable.

The trial court denied this claim because Mr. Muhammad did "not identify any specific lapse during the representation of the defendant that allegedly occurred because of the alleged conflict of interest." *Knight VII*, 923 So.2d at 403. The court further determined that "a claim of conflict of interest must be based on dual representation and not conflicts with an attorney's self-interest." *Id.* On appeal, the Florida Supreme Court rejected the claim as "without merit as a matter of law." *Id.* at 393.

■ Mr. Muhammad argues that the "Sixth Amendment right to effective assistance of counsel is violated when an attorney had a conflict of interest." D.E. 1 at 71. This is generally correct, but "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

■ In the instant petition, Mr. Muhammad does not make any such showing. Mr. Muhammad's entire argument is based on statements that his counsel made to the resentencing court, not on a motion to withdraw, but rather during argument on Mr. Muhammad's competency to stand trial. It is from his counsel's argument at a competency hearing that Mr. Muhammad now claims a conflict of interest existed and had "some adverse effect" on his counsel's representation. Mr. Muhammad does not cite one page in the extensive record. Regardless, as explained in greater detail in the text, this unsupported assertion is

record before me to where counsel's performance adversely affected him. Instead, he appears to be asserting a *per se* violation of the right to effective assistance of counsel. This claim fails, however, for the Eleventh Circuit does not recognize *per se* violations of the right to effective assistance of counsel based on allegations of conflict. *See McCorkle v. United States,* 325 Fed.Appx. 804, 808 (11th Cir.2009) (per curiam) (citing *Pegg v. United States,* 253 F.3d 1274, 1277 (11th Cir.2001)).

■ Even if I were not to apply the deferential AEDPA standard, Mr. Muhammad would have to show that "his attorney had an actual conflict of interest, and … that the conflict of interest adversely affected counsel's performance." *Id. See also Mickens v. Taylor,* 535 U.S. 162, 172 n. 5, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002) (discussing issue). He has not. He has argued—but has not established—that an actual conflict of interest existed and has completely failed to show that the alleged conflict affected counsel's performance. Significantly, defense counsels' apparent concerns over their own safety when meeting with Mr. Muhammad did not lead to a motion to withdraw. Comments made about how difficult counsel found it to deal with Mr. Muhammad were made in the context of a competency hearing. In such a context, these comments tended to support the argument put forth by Mr. Muhammad himself—namely, that he lacked competency and couldn't assist his counsel. Far from demonstrating a conflict, these comments appear to illustrate vigorous representation on his behalf.

Under the applicable AEDPA standard, Mr. Muhammad is not entitled to relief on this conflict-of-interest claim. The Florida Supreme Court's ruling that the claim was not dispositive.

# 1316

without merit did not involve an unreasonable application of clearly established federal law, as determined by the Supreme Court. Nor was it based on an unreasonable application of the facts.

## VIII. THE CLAIM AS TO POSSIBLE CONSECUTIVE SENTENCES

■■■ Mr. Muhammad contends that the trial court's refusal to determine and instruct the jury regarding consecutive life sentences with a minimum mandatory term of fifty years violated his Sixth, Eighth, and Fourteenth Amendment rights. I disagree.

Before the case went to the jury, Mr. Muhammad filed a motion to "determine alternative to death sentence and to present evidence regarding meaning of life sentence," Trial Tr., App. FF, at 1425. The trial court denied the motion insofar as Mr. Muhammad requested that it instruct the jury about consecutive sentences. It did grant the motion such that Mr. Muhammad's counsel was allowed to advise the jury "that he will be required to serve a total of at least 50 years in prison before he will be eligible for parole." Trial Tr., App. FF, at 3737. Mr. Muhammad contends that "[p]ostponing the decision whether the sentences would be consecutive or concurrent withheld from the jury accurate sentencing information and, by interfering with the jury's ability to give effect to other mitigating evidence, skewed the balancing process in favor of death." D.E. 1 at 77–78. Mr. Muhammad further argues that because the state relied upon future dangerousness in its closing, the trial court's refusal to determine in advance whether any non-capital sentences would be concurrent or consecutive violated his due process rights.

On direct appeal, the Florida Supreme Court rejected this claim. It found "the fact that both defense counsel and the trial judge informed the jury here that consecutive life sentences totaling a minimum

mandatory of fifty years could be imposed was sufficient to fully apprise the jury of the consequences of a life recommendation, and we find no abuse of discretion in the trial court's ruling." *Knight V,* 746 So.2d at 431. Mr. Muhammad did not raise this claim again in his Rule 3.850 proceeding.

Under the applicable AEDPA standard, Mr. Muhammad is not entitled to habeas relief. The Florida Supreme Court's ruling on the jury's apprisal of the consequences of a life sentence was not contrary to, or an unreasonable application, of clearly established federal law. Nor was the ruling based on an unreasonable determination of the facts.

Nowhere does Mr. Muhammad argue that the Florida Supreme Court's ruling on this claim was an unreasonable application of clearly established federal law or an unreasonable determination of the facts. Mr. Muhammad continues to assert, rather, the same arguments put forth on direct appeal which were reviewed and expressly rejected by the Florida Supreme Court under a different standard of review.

During closing argument, counsel for Mr. Muhammad specifically argued to the jury that if they chose to recommend life, "it could be two consecutive 25 year sentences." Trial Tr., App. FF, at 3893. Counsel further argued that a consecutive sentence would be essentially a life sentence to Mr. Muhammad, who was age 45 at the time of his resentencing. *See id.* And counsel advised the jury that even if they recommended a life sentence for Mr. Muhammad, the parole board "is not going to release him." Counsel further said that the judge would never give him a concurrent life sentence because no one would want him out of jail. *Id.* at 3894. Additionally, the trial court instructed the jury that a life-sentence recommendation would be for twenty-five years without the possibility of parole. *Id.* at 3928. In its in-

structions to the jury prior to deliberations, the trial court did not advise the jury whether the life sentences would be concurrent or consecutive.

"[T]he [Florida] legislature has vested the trial court with discretion in criminal cases to impose either concurrent or consecutive sentences in independent cases," *Bruce v. State,* 679 So.2d 45, 46 (Fla.Dist. Ct.App.1996) (per curiam), and it is true that the "Due Process Clause does not allow the execution of a person on the basis of information which he had no opportunity to deny or explain." *Simmons v. South Carolina,* 512 U.S. 154, 161, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (internal quotation marks omitted). *See also Kelly v. South Carolina,* 534 U.S. 246, 248, 122 S.Ct. 726, 151 L.Ed.2d 670 (2002) ("Last Term, we reiterated the holding of *Simmons v. South Carolina* that when a capital defendant's future dangerousness is at issue, and the only sentencing alternative to death available to the jury is life imprisonment without possibility of parole, due process entitles the defendant to inform the jury of his parole ineligibility, either by a jury instruction or in arguments by counsel.") (internal quotation marks omitted) (citation omitted). Here, though, the jury was properly informed that a life sentence recommendation as to Mr. Muhammad meant twenty-five years imprisonment per count of murder without the possibility of parole, and counsel argued that the court would give Mr. Muhammad consecutive 25–year sentences.

Mr. Muhammad's argument is premised primarily on a theory that the trial court was under a Constitutional obligation to inform the jury, in advance of the jury's deliberations and verdict, as to whether it would impose concurrent or consecutive life sentences if it were inclined to impose a life sentence rather than a death sentence. Mr. Muhammad, however, has cited no cases that stand for this proposition. Nor am I aware of any. *See Booker v. Sec'y Fla. Dep't of Corr.,* 684 F.3d 1121, 1124–26 (11th Cir.2012) (per curiam) (rejecting argument that state violated defendant's due process rights when state refused to give jury instruction on defendant's consecutive sentences). Therefore, under the applicable AEDPA standards, I cannot conclude that the Florida Supreme Court's denial of this claim was an unreasonable application of clearly established federal law as determined by the Supreme Court. Nor can I say that it based on an unreasonable application of the facts.

## IX. THE PEREMPTORY CHALLENGE CLAIM

Mr. Muhammad asserts that the trial court erred in denying a peremptory challenge of a juror, Ms. Rivero–Saiz, at the resentencing. Mr. Muhammad argues that the right to peremptorily challenge prospective jurors is guaranteed in Florida by statute and rule, and that the arbitrary denial of that right violates the Fourteenth Amendment's guarantee of due process.

Mr. Muhammad's counsel attempted to exercise a peremptory challenge as to Ms. Rivero–Saiz, a Hispanic female. The state objected, and the trial court required defense counsel to state a valid race-, gender-, or ethnic-neutral reason for the challenge. Mr. Muhammad's counsel stated that he believed her to be "a very weak juror" who "is just going to go along with somebody." Trial Tr., App. FF, at 1126. The trial court found there was no ethnic- or gender-neutral reason, and disallowed the peremptory challenge. *Id.* at 1127.

On direct appeal, the Florida Supreme Court denied this claim as procedurally barred because "the defense did not renew its objection before the jury was sworn." *Knight V,* 746 So.2d at 429 n. 7. After *Knight V,* Mr. Muhammad asserted this claim as one of ineffective assistance of counsel in his Rule 3.850 proceedings.

The trial court denied this claim, finding that "[d]efendant does not state what questions counsel failed to ask the jury panel or which questions counsel asked and should not have asked. This claim is legally insufficient." *Knight VII*, 923 So.2d at 403. Mr. Muhammad did not raise this issue on appeal to the Florida Supreme Court.

These rulings by the state courts are inconsistent. If Mr. Muhammad's peremptory challenge claim was barred on direct appeal because his counsel failed to renew the objection before the swearing in of the jury, then Mr. Muhammad may have had a potential ineffective assistance of counsel claim as to the failure to preserve the claim (at least as to the performance prong of *Strickland*). Nevertheless, the trial court in the Rule 3.850 proceeding all but ignored this aspect of the claim. The trial court focused on defense counsel's voir dire of the jury panel as opposed to counsel's failure to renew his prior objection to the denial of the peremptory challenge. In any event, because the denial of Mr. Muhammad's peremptory challenge of Ms. Rivero–Saiz did not offend due process, Mr. Muhammad is not entitled to habeas relief on the merits.

█ The United States Supreme Court has " 'long recognized' that 'peremptory challenges are not of federal constitutional dimension.' " *Rivera v. Illinois*, 556 U.S. 148, 152, 129 S.Ct. 1446, 173 L.Ed.2d 320 (2009) (quoting *United States v. Martinez–Salazar*, 528 U.S. 304, 311, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000)). "States may withhold peremptory challenges 'altogether without impairing the constitutional guarantee of an impartial jury and a fair trial.' " *Id.* (quoting *Georgia v. McCollum*, 505 U.S. 42, 57, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992)).

Mr. Muhammad contends that, because Florida has a statutory and procedural mechanism for peremptory challenges, an arbitrary denial of that right violates the Fourteenth Amendment's guarantee of due process. D.E. 1 at 80. But the denial here was not arbitrary. The trial court found Mr. Muhammad's challenge of the juror not supported by any gender- or ethnic-neutral reason. And Mr. Muhammad does not even argue, let alone show, that the denial of this peremptory challenge caused the jury to be partial against him or that the jury was improperly instructed.

█ Mr. Muhammad seems to argue, instead, that the denial of his peremptory challenge automatically violated due process because he had a race-, gender-, and ethnic-neutral reason for excluding Ms. Rivera–Saiz. Mr. Muhammad, however, is incorrect.

Because peremptory challenges are within the States' province to grant or withhold, the mistaken denial of a state-provided peremptory challenge does not, without more, violate the Federal Constitution. "[A] mere error of state law," we have noted, "is not a denial of due process." The Due Process Clause, our decisions instruct, safeguards not the meticulous observance of state procedural prescriptions, but "the fundamental elements of fairness in a criminal trial."

*Rivera*, 556 U.S. at 158, 129 S.Ct. 1446 (quoting *Engle v. Isaac*, 456 U.S. 107, 121 n. 21, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982), and *Spencer v. Texas*, 385 U.S. 554, 563–64, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967)). Nothing in the record indicates, nor has Mr. Muhammad shown, that his jury was constituted of persons who were not qualified for jury service and challengeable for cause. Mr. Muhammad may be understandably frustrated about the state courts' conflicting decisions on this claim, but that does not mean that habeas relief is warranted.

## X. The Claim on the Cold, Calculated, and Premeditated Aggravator Instruction

■ Under the Constitution, "[n]o State shall ... pass any ... ex post facto law." U.S. Const. art. I § 10. The Ex Post Facto Clause prohibits the operation of " 'any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with [a] crime of any defense available according to law at the time when the act was committed.' " *Dobbert v. Florida*, 432 U.S. 282, 292, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). It ensures that statutes "give fair warning of their effect," and "forbids the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred." *Weaver v. Graham*, 450 U.S. 24, 28, 30, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981).

Mr. Muhammad contends that the trial court's instruction on the cold, calculated, premeditated aggravating factor violated the Ex Post Facto Clause. As this argument goes, Mr. Muhammad murdered Mr. and Mrs. Gans in 1974, yet the Florida legislature did not add the cold, calculated, and premeditated aggravator to the death penalty statute until 1979. Thus, the argument continues, the application of the cold, calculated, and premeditated aggravator at the 1996 resentencing altered the definition of criminal conduct in existence at the time of the crimes or increased the punishment for the crimes.

On direct appeal, the Florida Supreme Court rejected this claim, noting it had "previously determined that application of [this] aggravator in this situation is not an ex post facto violation." *Knight V*, 746 So.2d at 434 (citing *Combs v. State*, 403 So.2d 418 (Fla.1981)). Plus, "the jury instruction given" in Mr. Muhammad's case, the Florida Supreme Court said, "was the same instruction approved in *Jackson v. State*, 648 So.2d 85 (Fla.1994), an interim instruction we have repeatedly found constitutional." *Id.* As explained below, although I think the Florida Supreme Court is wrong, I cannot grant habeas relief on this claim.

■ In this case, the state originally indicted Mr. Muhammad on two counts of first-degree murder in 1974. In 1975, a jury found him guilty of the Gans murders. It was not until July 1, 1979, however, that the cold, calculated, and premeditated aggravator become effective. At his resentencing in 1996, the trial court instructed the jury that it could consider the cold, calculated, and premeditated aggravator when it recommended whether to impose the death penalty. Specifically, the trial court said that the jury could consider whether "[t]he crime for which the defendant is to be sentenced was committed in a cold and calculated and premeditated manner and without pretense of moral or legal justification." Trial Tr., App. FF, at 3918–19. The prosecutor devoted six pages of the trial transcript to this aggravator, and the trial court, in adopting the jury's recommendation, and sentencing Mr. Muhammad to death, found this too to be an applicable aggravating circumstance:

> As stated *supra*, the evidence clearly established that the defendant, as part of his plan to obtain the $50,000.00, planned to leave no witnesses, and thus planned to kill the Ganses. He obtained the .30 caliber carbine in advance, he ignored opportunities to let the Ganses go after he had obtained the money, he had the Ganses drive to a remote area, and without provocation from the Ganses, he killed them—execution style, with a bullet to their necks. Where there has been advance procurement of a weapon, the lack of resistance or provocation by the victims, and the appearance of a

killing carried out as a matter of course, such are indications of the existence of this aggravating factor. *See Cruse v. State,* 588 So.2d 983 (Fla.1991). Contrary to the defendant's assertions at the sentencing hearing during the testimony of Dr. Wells, that he did not plan to kill the Ganses until he heard the police aircraft and helicopter and panicked, the evidence showed otherwise; that is, that neither the aircraft nor the helicopter was in the air near the defendant at either of the times that he had the Ganses stop the Mercedes in the isolated areas of southwest Dade County. Rather the evidence established two planned or pre-arranged murders. Thus the State has proven this aggravating circumstance beyond a reasonable doubt, *see, e.g., Thompson v. State,* 648 So.2d 692 (Fla.1994); *Eutzy v. State,* 458 So.2d 755 (Fla.1984), and it should be given great weight by this Court in determining the appropriate sentence for the defendant.

Trial Tr., App. FF, at 1497–98. In its sentencing order, the trial court noted the defense's argument that this aggravating factor should not be considered, but disagreed. The court then said that, "even in the absence of this aggravating circumstance the court's analysis and conclusions herein would not change." *Id.* at 1524.

■ Under Supreme Court precedent, two elements make a criminal or penal law *ex post facto:* "it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." *Weaver,* 450 U.S. at 29, 101 S.Ct. 960 (footnote omitted). To begin with, I easily conclude that the aggravating factor applied by the trial court was not in existence at the time that Mr. Muhammad was initially convicted and sentenced to death in 1975. *See Jennings v. Crosby,* 392 F.Supp.2d 1312, 1341 (N.D.Fla.2005) (Hinkle, J.) (explaining the history of the cold,

calculated, and premeditated factor), *aff'd sub nom. Jennings v. McDonough,* 490 F.3d 1230 (11th Cir.2007). Accordingly, the cold, calculated, and premeditated aggravator is retrospective. I also conclude that the cold, calculated, and premeditated aggravator disadvantages offenders retroactively affected by it. For example, laws that retroactively increase the presumptive reasonable sentence and that take a prisoner's earned credit for good conduct disadvantage offenders and, if retrospective, violate the Ex Post Facto Clause. *See Miller v. Florida,* 482 U.S. 423, 424–25, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987); *Weaver,* 450 U.S. at 33, 101 S.Ct. 960. The aggravator here disadvantages an offender like Mr. Muhammad, for it expands those situations in which the state may impose the death sentence.

Imagine a state with the same aggravators as Florida, but without the cold, calculated, and premeditated aggravator. Imagine too a husband who plots to poison his wife with hemlock or some untraceable chemical. He plans it out perfectly for a year. He goes through with the plan, he gives the poison to her in a wine glass, and she drinks it. The murderer's motive is simply that, after years of friction, he no longer cares for his wife. The wife dies peacefully, without much pain. The state charges the husband with murder and seeks the death penalty. In this hypothetical, the murderer did not commit an especially "heinous, atrocious, or cruel" murder, at least as defined by Florida law. He also did not kill for money. Assume too that the murderer was a law-abiding citizen until he killed his wife. If true, then he was not previously convicted of a violent felony. In other words, no relevant aggravators under Florida law would apply, and the husband would be ineligible for the death sentence.

Imagine now that there is a cold, calculated, and premeditated aggravator, as in Florida. It is clear, from the facts set out above, that the murder was cold, calculated, and premeditated. Thus, in Florida, the murderer could possibly face the death penalty. Without the cold, calculated, and premeditated aggravator, the maximum penalty is life; with the cold, calculated, and premeditated aggravator, the maximum penalty is death. The aggravator, if found to exist, disadvantages our hypothetical murderer. For this reason, the Fourth Circuit has held that "statutory aggravating factors which render an offense of conviction death-eligible clearly increase the punishment for criminal acts" and hence violate the Ex Post Facto Clause if created after the offense. *United States v. Higgs*, 353 F.3d 281, 301 (4th Cir.2003). *See also United States v. Kapordelis*, 569 F.3d 1291, 1314 (11th Cir. 2009) ("Pursuant to the Ex Post Facto Clause, if applying the Guidelines in effect at the time of sentencing would result in a harsher penalty, a defendant must be sentenced under the Guidelines in effect at the time when he committed the offense."). Indeed, Judge Hinkle has found Florida's retroactive application of the cold, calculated, and premeditated aggravator to violate the Ex Post Facto Clause. *See Jennings*, 392 F.Supp.2d at 1341–42.

*Dobbert*, 432 U.S. at 292, 97 S.Ct. 2290, lends no support to the conclusion that there is no Ex Post Facto Clause violation. Unlike the procedural changes at issue in *Dobbert*, the retroactive application of the cold, calculated, and premeditated aggravator is not, as the Eleventh Circuit put it, "on the whole ameliorative." *Magwood v. Warden*, 664 F.3d 1340, 1349 n. 8 (11th Cir.2011). Simply stated, the "application of the new aggravating factor made it easier for the Florida judge to sentence [Mr. Muhammad] to death, and for that reason alone was more onerous for [Mr. Muhammad] than the sentencing procedure in place at the date of the offense." *Justus v. Florida*, 465 U.S. 1052, 1053, 104 S.Ct. 1332, 79 L.Ed.2d 726 (1984) (Marshall, J., dissenting from denial of certiorari).

I agree with Judge Hinkle (as well as with the Fourth Circuit in *Higgs*) with respect to the Ex Post Facto problems posed by retroactive application of an aggravating factor in a capital case, and if I were exercising plenary review on a blank slate I would grant habeas relief on this ground as well. The claim that *adding* an aggravating factor somehow does not prejudice a criminal defendant is "simply untenable." *Id.* At the very least, it is untenable when the aggravating factor is created from scratch after the commission of the crime. *Cf. Trotter v. Sec'y Dep't of Corr.*, 535 F.3d 1286, 1291 (11th Cir.2008) (rejecting Ex Post Facto Clause claim based on aggravating factor because, as a result of the Florida Supreme Court's reversing of a prior decision, "the statute of aggravating factors included service on community control when [the defendant] committed his crime").

Still, I cannot grant Mr. Muhammad any relief on this claim. I am bound by the Eleventh Circuit precedent, and the Eleventh Circuit has rejected Mr. Muhammad's Ex Post Facto Clause argument. *Francis v. Dugger*, 908 F.2d 696, 705 (11th Cir. 1990), held "that no ex post facto violation occurred because the application of the aggravating circumstance 'cold, calculated, and premeditated' did not disadvantage" the defendant. Quoting the district court, the *Francis* panel gave the following reasoning for its holding:

[T]he facts on which the trial judge relied in applying the "cold, calculated, and premeditated" factor were the same facts underlying application of other aggravating factors, such as "hindering law enforcement" and "especially atrocious and cruel." Francis argues that the ret-

rospective application of this factor adversely affected his sentence because the trial judge mistakenly enumerated three, rather than two aggravating factors. The Florida sentencing scheme is not founded on "mere tabulation" of aggravating and mitigating factors, but relies instead on the weight of the underlying facts.

*Id.* It is true, of course, that Florida is a weighing state. Juries do not simply add the aggravating factors and subtract the mitigating factors (or vice-versa). But that isn't the same as saying that aggravating factors do not affect a capital case's determination to the defendant's detriment.

Under Florida's scheme, the jury and judge are free to give whatever weight they want to an aggravating factor. And common sense tells us that two is larger than one. Likewise, common sense dictates that two factors in favor of a capital sentence is a more persuasive reason for imposing a capital sentence than one factor in favor. The Eleventh Circuit's reasoning ignores this truism; it pretends as if the Florida legislature had no reason for its expansion of the aggravating factors to include "cold, calculated, and premeditated" murders. Nevertheless, *Francis* binds me, and I therefore reject Mr. Muhammad's Ex Post Facto Clause argument.

## XI. THE CRUEL AND UNUSUAL PUNISHMENT CLAIM

 Mr. Muhammad has been on Florida's death row for over 30 years. He argues that because of his solitary confinement on the Q Wing of the Florida State Prison (following the 1980 murder of Officer Burke), execution would constitute unconstitutionally cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. He also argues that his execution after his inordinately long stay on death row would violate international law and norms.

On direct appeal, in 1999, the Florida Supreme Court found that Mr. Muhammad made "an interesting argument" but concluded that it lacked merit because "no federal or state courts have accepted [the] argument that a prolonged stay on death row constitutes cruel and unusual punishment, especially where both parties bear responsibility for the long delay." *Knight V*, 746 So.2d at 437. The Florida Supreme Court also commented that, "irrespective of the status of this case, [Mr. Muhammad] has been and will remain incarcerated on death row for his 1980 murder of Officer Burke until that case is finalized." *Id.*

Mr. Muhammad sought certiorari in the Supreme Court on this claim. The Supreme Court denied Mr. Muhammad's petition. Justice Thomas concurred "to point out that [he was] unaware of any support in the American constitutional tradition or in this Court's precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed." *Knight VI*, 120 S.Ct. at 459 (Thomas, J., concurring). Justice Breyer, in contrast, dissented from the denial of the petition: "Where a delay, measured in decades, reflects the state's own failure to comply with the Constitution's demands, the claim that time has rendered the execution inhuman is a particularly strong one. I believe this Court should consider that claim now." *Id.* at 462 (Breyer, J., dissenting).

Mr. Muhammad did not re-assert this claim in his post-conviction motion. In any event, under the applicable AEDPA standard, Mr. Muhammad is not entitled to habeas relief. Given the absence of Supreme Court precedent, the Florida Supreme Court's rejection of the Eighth Amendment claim was not contrary to, or an unreasonable application of, clearly established federal law. Nor was the ruling

based on an unreasonable determination of the facts.

It is also important to note that the Eleventh Circuit has recently rejected the claim asserted by Mr. Muhammad. *See Thompson v. Sec'y Dep't of Corr.*, 517 F.3d 1279, 1284 (11th Cir.2008) (per curiam) ("Especially given the total absence of Supreme Court precedent that a prolonged stay on death row violates the Eighth Amendment guarantee against cruel and unusual punishment, we conclude that execution following a 31–year term of imprisonment is not in itself a constitutional violation."). *See also Tompkins v. Sec'y Dep't of Corr.*, 557 F.3d 1257, 1260–61 (11th Cir.2009) (per curiam) (denying COA on claim that 24–year delay in carrying out death sentence violated the Eighth Amendment).[14]

### XII. THE COMPETENCY CLAIM

■■■ Mr. Muhammad contends that he "may well be incompetent at the time of execution," which would violate his "Eighth Amendment right against cruel and unusual punishment." D.E. 1 at 101. Mr. Muhammad raised this claim in his Rule 3.850 proceeding, but the trial court denied this claim, acknowledging that it was being raised purely for preservation purposes. *See Knight VII*, 923 So.2d at 418. The Florida Supreme Court found this claim "without merit as a matter of law." *Id.* at 392 n. 9.

■■■ A state cannot execute an insane or incompetent defendant under the Eighth Amendment. *See Atkins v. Virginia*, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); *Ford v. Wainwright*, 477 U.S. 399, 401, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). Although Mr. Muhammad has asserted a *Ford* claim in his current petition, he correctly acknowl-

edges that such a claim is premature, for he is not currently incompetent, execution is not imminent, and no death warrant has issued. *See Panetti v. Quarterman*, 551 U.S. 930, 946–47, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007); *Pierce v. Blaine*, 467 F.3d 362, 367 n. 2 (3d Cir.2006). Rather, he asserts that this claim "must be raised in the instant· petition for habeas corpus" and admits that it was done so purely for "preservation purposes." D.E. 1 at 102. Because it is not ripe, I deny this claim without prejudice.

### XIII. THE FUTURE DANGEROUSNESS CLAIM

Mr. Muhammad maintains that the prosecution's reliance on the nonstatutory aggravating circumstance of future dangerousness tainted the validity of the jury's recommendation and undermined the reliability of the sentencing hearing. As noted, defense counsel presented several mental health expert's testimony on Mr. Muhammad's mental state. The state, during cross examination, offered testimony on Mr. Muhammad's ability to be cured and potentially successful treatment possibilities. Mr. Muhammad argues that the prosecutor used this information, along with improper and impermissible argument (Mr. Muhammad would "kill, and kill and kill again") during closing argument to taint the jury with the concept of future dangerousness as an aggravator.

On direct appeal, the Florida Supreme Court denied this claim. It first found the argument to be procedurally barred because Mr. Muhammad never objected to the statement. Second, it found that "none of the instances of alleged impropriety were objected to or argued to the trial court and, therefore, they are procedurally barred." *Knight V*, 746 So.2d at

---

**14.** I note that Mr. Muhammad's case does not present a situation where a capital defendant does not file any appeals or post-conviction motions, and the state nevertheless delays more than 30 years in carrying out the death sentence.

432. In a footnote, the court also noted that "[a]lthough the [kill, and kill, and kill again] comment approaches the border of impropriety, and was probably subject to a valid objection, we conclude that the State did not impermissibly inject Knight's 'future dangerousness' into the proceedings as an unlawful nonstatutory aggravating circumstance sufficiently to constitute fundamental error." *Knight V*, 746 So.2d at 431 n. 10.

The trial court in the Rule 3.850 proceeding rejected this claim. It found that the "Florida Supreme Court concluded that the State did not impermissibly inject [Mr. Muhammad's] future dangerousness as an unlawful non-statutory aggravating circumstance sufficiently to constitute fundamental error." *Knight VII*, 923 So.2d at 403. On appeal, the Florida Supreme Court found this claim "procedurally barred," and, when Mr. Muhammad argued that his counsel failed to object to the prosecutor's comments, it found the argument "without merit as a matter of law." *Id.* at 392 nn. 6–9.

During the state's closing argument to the jury at the resentencing proceeding, the prosecutor argued as follows:

> What is the proper recommendation for a person like that? How do we punish somebody who has no conscience, who can act and act again, kill, and kill and kill again but does not have a conscience about it? Somebody who won't control himself.
>
> . . . .
>
> It just worked out that way and [Mr. Muhammad] was the worst of the worst. He always was and according to the doctors he always will be.
>
> . . . .
>
> I can only ask you was it good enough for Richard James Burke or maybe are there some people for whom there is no prison safe enough?

> If the death penalty is not enough for a person like [Mr. Muhammad], it has no purpose. An awful person who commits awful crimes beyond hope of rehabilitation and then does it again and again, and the great shame of this is he is a wasted life. Highly intelligent man, got his GED in prison, reads Chess review and New York Times and law books.

Trial Tr., App. FF, Vol. 33–34. At the conclusion of the state's closing argument, counsel for Mr. Muhammad made a motion for mistrial because the state repeatedly "argued in effect that the jury should recommend death because of the continuing and future dangerousness of the defendant which is clearly not the aggravating circumstances in Florida." Trial Tr., App. FF, at 3876. The trial court denied the motion. *Id.* at 3877.

To be sure, the state should not have argued Mr. Muhammad's future dangerousness, for a future dangerousness nonstatutory aggravator does not exist in Florida. *See Kormondy v. State*, 703 So.2d 454, 463 (Fla.1997) (per curiam). The Florida Supreme Court has explained that "the probability of recurring violent acts by the defendant if he is released on parole in the distant future" is not a proper aggravating circumstance in Florida. *See Miller v. State*, 373 So.2d 882, 886 (Fla.1979). Moreover, the state may not attach aggravating labels to factors that actually should militate in favor of a lesser penalty—like, as in this case, the defendant's mental impairment. *See Zant v. Stephens*, 462 U.S. 862, 885, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

Here, the trial court denied Mr. Muhammad's motion for a mistrial but instructed the jury that "[t]he aggravating circumstances that you may consider are limited to any of the following that are established by the evidence." The judge only instructed the jury on statutory ag-

gravators and did not advise the jury at all about future dangerousness. Before closing statements, the trial judge advised the jury that "[w]hat the attorneys say is not evidence. Again its purpose is only to give you a perspective on what you have seen and what you have heard." Trial Tr., App. FF, at 3767.

After careful review of the record, I find that the prosecutor's closing argument, though improper, did not deprive Mr. Muhammad of a fair resentencing hearing. In other words, this error was harmless. Additionally, there is nothing in the record to suggest that the trial court considered this non-statutory aggravator when adopting the jury's recommendation to impose a death sentence on Mr. Muhammad. Accordingly, the decision of the Florida Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law.

### XIV. THE *RING* CLAIM

 Mr. Muhammad contends that Florida's death penalty scheme—in which a jury recommends a sentence of life imprisonment or death, but the trial court actually decides what sentence to impose—and his death sentence are unconstitutional in light of *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). *Ring* held that, under the Sixth Amendment, a sentencing court cannot, over a defendant's objections, make factual findings with respect to aggravating circumstances necessary for the imposition of the death penalty. Such findings must, as a constitutional matter, be made by a jury. *See id.* at 609, 122 S.Ct. 2428. Mr. Muhammad argues that his death sentence must be set aside under *Ring* because the trial court imposed the sentence and made factual findings as to the existence of aggravating factors.

As Mr. Muhammad recognizes, his *Ring* claim is foreclosed by Supreme Court precedent. In *Schriro v. Summerlin,* 542 U.S. 348, 355–57, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), the Supreme Court ruled that *Ring* would not be retroactively applied to cases which had become final before *Ring* was decided. Mr. Muhammad's current death sentence became final (for retroactivity purposes) in November of 1999, when the Supreme Court denied certiorari in *Knight VII.* Because *Ring* was not decided until 2002, Mr. Muhammad cannot obtain the benefit of that decision in this habeas corpus proceeding. *See Sibley v. Culliver,* 377 F.3d 1196, 1207–08 (11th Cir.2004). The *Ring* claim is therefore denied.[15]

### XV. CONCLUSION

Mr. Muhammad's petition for a writ of habeas corpus is CONDITIONALLY GRANTED as to sentencing on the Confrontation Clause claim, and is denied in all other respects. The state shall provide Mr. Muhammad with a resentencing hearing within one year of this order, or shall commute his death sentences for the Gans murders to life sentences consistent with Florida law. *See Knight IV,* 863 F.2d at 710.

The Clerk is directed to close this case.

---

**15.** I note also that the Eleventh Circuit has recently held that, in light of cases like *Hildwin v. Florida,* 490 U.S. 638, 639, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989) (rejecting Sixth Amendment challenge to Florida's capital sentencing procedures), lower courts cannot use *Ring* to find Florida's scheme unconstitutional. *See Evans v. Sec'y Fla. Dept. of Corr.,* 699 F.3d 1249, 1264–66 (11th Cir.2012).